**UNITED STATES of America, Plaintiff,**

v.

**DELTA DENTAL OF RHODE ISLAND, Defendant.**

**C.A. No. 96–113/P.**

United States District Court, D. Rhode Island.

Oct. 2, 1996.

---

Anthony C. DiGioia, U.S. Attorney's Office, Providence, RI, Anne K. Bingaman, Joel I. Klein, Rebecca P. Dick, Gail Kursh, David Jordan, Steven Kramer, Paul J. O'Donnell and Michael S. Spector, U.S. Department of Justice, Antitrust Division, Washington, DC, for Plaintiff.

William R. Landry, Blish & Cavanagh, Providence, RI, and William Kopit, Epstein, Becker & Green, P.C., Washington, DC, for Defendant.

### ORDER AND MEMORANDUM

PETTINE, Senior District Judge.

The Report and Recommendation of United States Magistrate Judge, Robert W. Lovegreen filed on July 12, 1996 in the above-captioned matter is hereby accepted pursuant to 28 U.S.C. § 636(b)(1).

Delta Dental of Rhode Island ("Delta") objects to the Magistrate Judge's ("Magistrate") Report and Recommendation, which recommended a denial of Delta's Fed. R.Civ.P. 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Accordingly, I must make a *de novo* "determination of those portions of the report ... to which objection is made." 28 U.S.C. § 636(b)(1)(B). After carefully considering the Magistrate's Report and Recommendation, Delta's objections, and the United States of America's ("Government")'s Opposition to Defendant's Objections to the Magistrate's Report and Recommendation, for the following reasons, I fully accept the Magistrate Judge's Report and Recommendation. In so doing, I incorporate in whole, and without discussion, the Magistrate's statement of facts as well as the Magistrate's discussion of Fed.R.Civ.Proc. 12(b)(6) standards, and, for reasons of clarity, I attach in full the Magistrate's Report and Recommendation.

### DISCUSSION

*1. Sherman Antitrust Act, § 1 and § 2: General Principles*

To fully understand Delta's objections to the Magistrate's Report and Recommendation, it is important to understand §§ 1 and 2 of the Sherman Act.

According to § 1 of the Sherman Act ("§ 1"), "[e]very contract, combination .. or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is declared illegal." 15 U.S.C. § 1. § 1 plaintiffs must prove the existence of two elements: (1) a contract, combination, or conspiracy among two or more parties, that (2) unreasonably restrains trade.[1] *Standard Oil Co. v. United States,* 221 U.S. 1, 59–60, 31 S.Ct. 502, 515–16, 55 L.Ed. 619 (1911). The second element, unreasonable restraint of trade, can be further divided into two categories of cases. Courts consider whether a restraint on trade is either: (1) a *per se* violation;[2] or (2) a restraint subject to the "rule of reason" analysis. "Under this rule, the fact finder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Thus, the rule of reason analysis

---

1. Under § 1, plaintiff also must show that the restraint affects interstate or foreign commerce. However, since there is no dispute that Delta's alleged conduct affects interstate commerce, I do not discuss this element here.

2. "Per se rules of illegality are appropriate only when they relate to conduct that is manifestly anticompetitive." *Continental T.V., Inc. v. Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557–58, 53 L.Ed.2d 568 (1977).

requires courts to conduct a highly fact-specific inquiry.[3]

In the case at hand, the Government does not allege that Delta's Prudent Buyer clause (also referred to as "Most Favored Nation" or "MFN" clause) is a per se violation of § 1. Therefore, I must apply the "rule of reason" analysis. According to this analysis, the Government has the burden of showing "that the anti-competitive effects of the agreement outweigh their legitimate business justifications." *Monahan's Marine Inc. v. Boston Whaler Inc.*, 866 F.2d 525, 526–27 (1st Cir. 1989).

Whereas § 1 requires the existence of a "contract, combination ... or conspiracy" and thus requires the involvement of two or more entities, § 2 of the Sherman Act, ("§ 2") regulates the unilateral conduct of a single entity "when it threatens actual monopolization." *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752, 767, 104 S.Ct. 2731, 2739, 81 L.Ed.2d 628 (1984). A § 2 plaintiff establishes a violation by showing two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 480, 112 S.Ct. 2072, 2089, 119 L.Ed.2d 265 (1992), *quoting, United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Plaintiffs generally have more difficulty establishing the second element. "The second element of a § 2 claim is the use of monopoly power 'to foreclose competition, or to destroy a competitor.'" *Eastman Kodak, supra*, 504 U.S. at 482, 112 S.Ct. at 2090, *quoting, United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). In other words, the second element involves proving "a scheme of willful acquisition or maintenance of monopoly power." *Eastman Kodak, supra*, 504 U.S. at 483, 112 S.Ct. at 2091.

In sum, § 1 primarily regulates anticompetitive agreements between two or more entities, while § 2 typically regulates the unilateral action of a single entity. Further, the relevant inquiries under § 1 and § 2 are distinct.

### 2. Discussion Of Delta's Objections To The Magistrate's Report and Recommendation

Delta raises a number of objections to the Magistrate's Report and Recommendation. I will discuss these objections in the context of § 1's two required elements.

### a. The Magistrate Properly Concluded That Delta's Prudent Buyer Clause Is Sufficient to Satisfy the "Concerted Action" Requirement of § 1

In its Motion to Dismiss, Delta argued that the Government's "complaint challenges a contractual provision which is automatically included in all contracts between Delta Dental and its participating dentists as a matter of a *unilateral policy*, and thus fails to allege conspiratorial action sufficient to state a claim under § 1 of the Sherman Act." Defendant Delta Dental of Rhode Island's Motion to Dismiss [emphasis added]. The Magistrate, in his Report and Recommendation, rejected this argument stating:

Although the Supreme Court has recognized that § 1 does not reach conduct that is "wholly unilateral," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752,

---

**3.** The *Continental T.V.* Court took note of the fact-intensive inquiry the rule of reason analysis requires, stating:

One of the most frequently cited statements of the rule of reason is that of Mr. Justice Brandeis in *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effects, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant factors."

*Continental T.V., supra*, 433 U.S. at 49, 97 S.Ct. at 2557.

767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984), concerted action may be amply demonstrated by an express agreement. *Addyston Pipe & Steel Co. v. United States*, 175 U.S. 211, 213–218, 20 S.Ct. 96, 97–99, 44 L.Ed. 136 (1899). Here, there is no dispute that each participating dentist agrees explicitly to comply with Delta's Participating Dentist's Agreement, which incorporates by reference Delta's Rules and Regulations, including the MFN clause at issue. Thus, every contract between Delta and a participating dentist contains the MFN clause at issue. As a result, the requisite concerted action has been alleged.

Magistrate's Report and Recommendation, at 9–10. Delta objects to the Magistrate's reasoning, arguing that "since the United States Supreme Court's decision in *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), the threshold for vertical restraint cases under Section 1 has become considerably higher than the Report and Recommendation would suggest." Memorandum of Defendant Delta Dental of Rhode Island in Support of Its Objections to Magistrate's Report and Recommendation, at 58. According to Delta, under *Monsanto*, a § 1 conspiracy requires a "meeting of the minds" between the supplier and purchaser. Delta contends that the Prudent Buyer clause does not manifest this required "meeting of the minds," but rather merely constitutes a unilateral policy on the part of Delta and unilateral acceptance of the policy by participating dentists.

With this objection, Delta is merely reiterating its position that the Prudent Buyer clause is nothing more than a unilateral policy. Accordingly, because the Magistrate adequately responded to this argument in his Report and Recommendation, and because Delta raises no additional arguments in its objection, I must reject Delta's objection.

Moreover, Delta's argument is disingenuous. The Government has averred that it is clear to all dentists participating in Delta that they must comply with the Prudent Buyer policy, and it is just as clear that if they receive fees lower than Delta's set fee schedule, they run the risk of Delta lowering

their reimbursement fees. To highlight this allegation, the Government cites a January 1994 letter Delta allegedly wrote to participating dentists to discourage them from participating in Dental PPO of Rhode Island. The letter states in relevant part:

> [Y]our profile reflects certain adjustments necessitated by our reimbursement policy. We understand that you have agreed to accept these fees from the Dental Blue PPO. As a result, your Delta Dental of Rhode Island reimbursement has been limited to these levels.

Complaint, ¶ 23. Through this letter, Delta makes it abundantly clear to participating dentists that the only way to avoid the risk of lower Delta fees is to refuse to accept any fees lower than Delta's fee schedule. Thus, despite Delta's contentions otherwise, its Prudent Buyer clause is not merely a unilateral policy on the part of Delta. Rather, it is a contractual clause to which Delta dentists expressly agree to comply. Further, pursuant to this contractual clause, Delta dentists are well aware that charging lower fees may result in Delta lowering their reimbursement rate.

Delta also argues that the Government did not allege that Delta Dental "coerced" the participating dentists. Memorandum of Defendant Delta Dental of Rhode Island in Support of Its Objections To Magistrate's Report and Recommendation, at 64. According to Delta, "cases which have inferred 'concerted action,' have done so only where there were threats of termination or other forms of retaliation," *Id.*, at 65. But the cases upon which Delta relies constitute a narrow line of case law, all involving resale agreements wherein suppliers control the resale price of goods sold to resalers. This resale relationship is substantially different from Delta's relationship with participating dentists.

Further, the cases cited by Delta do not hold that coercion is a required element of a § 1 violation. Rather, these cases hold that coercion is just one factor in the § 1 inquiry, and other factors may be relevant to finding a § 1 violation. In fact, in *FTC v. Beech–Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922), cited by Delta, the Supreme Court relied on a number of factors in

determining that Beech–Nut's pricing policy amounted to an illegal conspiracy, including Beech–Nut's practice of actively surveying prices resalers charged for Beech–Nut products. *Id.* at 454, 42 S.Ct. at 154; *see also, Yentsch v. Texaco, Inc.,* 630 F.2d 46, 54 (2d Cir.1980) ("The coercive atmosphere may have been enhanced by a policy of price surveillance."). The Government alleges, and Delta does not deny, that Delta monitors the fees participating dentists receive. "Rule 7 of Delta's Rules and Regulations further allows Delta to audit the records of any participating dentist." Complaint, ¶ 14.[4] Thus, Delta's careful monitoring of its participating dentists's fees may suggest that Delta's Prudent Buyer clause is anticompetitive.

In sum, for the reasons set forth in the Magistrate's Report and Recommendation, and for the reasons I have given, I find that the Government's complaint sets forth facts sufficient to withstand a motion for dismissal with regard to "concerted action" under § 1 of the Sherman Act.

*b. The Magistrate Properly Concluded That The First Circuit Cases, Kartell and Ocean State, Do Not Establish A Rule That Prudent Buyer Clauses Are Competitive As A Matter Of Law Absent Pricing That is Predatory Or Below Incremental Costs*

■ The gravamen of Delta's objections to the Magistrate's Report and Recommendation is that the Magistrate failed to follow the rule of law set down in the First Circuit cases, *Kartell v. Blue Shield of Massachusetts, Inc.,* 749 F.2d 922 (1st Cir.1984), *cert. den.,* 471 U.S. 1029, 105 S.Ct. 2040, 85 L.Ed.2d 322 and *Ocean State Physicians Health Plan v. Blue Cross and Blue Shield of Rhode Island,* 883 F.2d 1101 (1st Cir. 1989), *cert. den.,* 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990). However, I find that the Magistrate properly concluded that:

[d]espite *Kartell* and *Ocean State's* broad language, these decisions, properly construed, fail to establish a *per se* validation of the MFN clauses in all cases where pricing is not predatory or below incremental costs. Such a blanket condonation of MFN clauses would ignore the context *Kartell* and *Ocean State* were decided in, run counter to the Sherman Act's preference for fact-specific inquiries, implausibly reject the premise that MFN clauses produce substantial anticompetitive effects in particular circumstances and contradict the Sherman Act's animating concern for low consumer prices.

Magistrate's Report and Recommendation, at 20. Key to the Magistrate's conclusion that courts must not read *Kartell* and *Ocean State* as establishing a per se rule regarding Prudent Buyer clauses are the facts that: (1) both *Kartell* and *Ocean State* arose in contexts different from the one here; and (2) *Kartell* and *Ocean State* both involved low consumer prices, while here the Government alleges higher consumer prices. I fully agree with the Magistrate that these two distinctions militate against reading *Kartell* and *Ocean State* as resolving the case at hand, and I add the following points to the Magistrate's Report and Recommendation.

Delta argues that *Kartell* and *Ocean State* establish that Prudent Buyer clauses, absent predatory pricing or incremental costs, are competitive as a matter of law. The Government concedes that these cases validate the clause on its face, but asserts that this Court must look behind the face of the clause to its *effects.* According to the Government, the clause has anticompetitive effects, which *Kartell* and *Ocean State* do not validate. A careful examination of the the two First Circuit decisions reveals that the Government has the better position.

The First Circuit in *Kartell* upheld Blue Shield's "ban on balanced billing" policy against a § 1 of the Sherman Act challenge. The court found that Blue Shield's policy

---

4. Rule 7 provides:
   *Verification program.* Delta Dental at all times reserves the right to review services rendered and fees charged by participating and nonparticipating dentists or group practices with respect to which benefits are sought.

Such review may encompass, without limitation verification of … fees charges and collections made with respect to non-subscriber patients…
Complaint, ¶ 14.

could not be anticompetitive unless Blue Shield was viewed as a " 'third force,' intervening in the marketplace in a manner that prevents willing buyers and sellers from independently coming together to strike price/quality agreements." *Id.* at 924. The court found, however, that Blue Shield must be viewed:

> not as an inhibitory 'third force,' but as itself the purchaser of the doctors' services ... Antitrust law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold. Thus, the more closely Blue Shield's activities resemble, in essence, those of the purchaser, the less likely that they are unlawful.

*Id.* at 924–25. The First Circuit went on to emphasis Blue Shield's role as purchaser on behalf of its enrollees. "Once one accepts the fact that, from a commercial perspective, Blue Shield in essence 'buys' medical services *for the account of others* [it becomes apparent] that the ban on balance billing is permissible." *Id.* at 925 [emphasis added]. The court illustrated the point with examples:

> Suppose a father buys toys for his son—toys the son picks out. Or suppose a landlord hires a painter to paint his tenant's apartment, to the tenant's specifications. Is it not obviously lawful for the father (the landlord) to make clear to the seller that the father (the landlord) is in charge and will pay the bill? Why can he not then forbid the seller to charge the child (the tenant) anything over and above what the father (the landlord) pays—at least if the seller wants the buyer's business? ... In each of these instances, to refuse to allow the condition would disable the buyer from holding the seller to the price of the contract. Yet, if it is lawful for the buyer to buy for the third party in the first place, how can it be unlawful to bargain for a price term that will stick?

*Id.* These examples highlight the First Circuit's reliance on the concept that Blue Shield was acting as a purchaser when it purchased, on behalf of its enrollees, services from doctors at the lowest possible prices.

On its face, Delta's Prudent Buyer clause is indistinguishable from Blue Shield's ban on balanced billing. Delta's Prudent Buyer clause appears to guarantee that Delta purchases dental services for its enrollees for the lowest fee that the dentists are willing to receive. However, as stated earlier, the Government contends that it is important to look at the *effects* of Delta's Prudent Buyer clause, and not merely the clause as written. According to the Government, the Prudent Buyer clause has the effect of "exclud[ing] potential rivals, retard[ing] expansion by existing competitors, and substantially increas[ing] the costs to Rhode Island consumers of dental insurance and dental services." Complaint, at 1. Viewed in this light, Delta looks less like the ideal purchaser that the *Kartell* court portrayed.[5] *Kartell* is distinguishable from this case because the ban on balanced billing at issue in *Kartell* resulted in low prices for Blue Shield's enrollees, while the Government alleges that Delta's Prudent Buyer policy at issue here ultimately results in higher prices for Rhode Island dental service consumers.

The *Kartell* court itself underscored the importance of this low consumer price versus high consumer price distinction:

> [T]he Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too high, not too low ... And, *the relevant economic considerations may be very different when low prices, rather than high prices, are at issue.* These facts suggest that courts at least should be cautious—reluctant to condemn too speedily—an arrangement that,

---

5. This point is highlighted by the difference in postures between *Kartell* and the case here. In *Kartell,* the plaintiff represented a group of physicians challenging Blue Shield's policy, in large part because Blue Shield's reimbursement rates were so low that they reduced physician profits. These low prices, however, benefitted Blue Shield enrollees through lower premium rates. Here, plaintiff is the United States. Rhode Is-

land dentists apparently do not disapprove of Delta's Prudent Buyer clause. In fact, the chair of Rhode Island Dental Association's Council on Dental Programs supports Delta's Prudent Buyer policy because he feels that the policy sets a floor on dentists' fees. Memorandum of the United States in Opposition to the Defendant's Objections to the Magistrate's Report and Recommendation, at 9; Complaint, ¶ 22.

on its face, appears to bring low price benefits to the consumer.

*Id.* at 931.

Similarly, *Ocean State* does not resolve the issue presented here, not only because *Ocean State*, like *Kartell*, involved *lower* consumer prices, but also because the context of *Ocean State* is different from the context here. *Ocean State* plaintiffs, Ocean State Physicians Health Plan ("Ocean State"), sued Blue Cross/Blue Shield of Rhode Island ("Blue Cross") under § 2 of the Sherman Act, alleging that Blue Cross "had acted unlawfully to exclude Ocean State from the health care insurance marketplace." *Id.* at 1102. Among other claims, Ocean State alleged that Blue Cross adopted its "Prudent Buyer policy not in order to save money, but rather to induce physicians to resign from Ocean State." *Id.* at 1104. The jury found that Blue Cross had violated § 2 of the Sherman Act, but the District Court granted Blue Cross' motion for a judgment notwithstanding the verdict. On appeal, the First Circuit agreed "with the district court ... that the Prudent Buyer policy—through which Blue Cross ensured that it would not pay a provider physician any more for any particular service than she was accepting from Ocean State or any other health care purchaser—is, as a matter of law, not violative of section 2 of the Sherman Act." *Id.* at 1110.

As stated above, allegations of a § 2 violation invoke consideration of two elements: (1) existence of monopoly power; and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co., supra,* 504 U.S. at 480, 112 S.Ct. at 2089. On appeal, Blue Cross conceded the first prong, and did not dispute its monopoly power; Ocean State conceded that Blue Cross legitimately acquired its market power. *Id.* at 1110. Thus, the very narrow issue before the First Circuit was "whether Blue Cross maintained its monopoly power through improper means." *Id.* In fact, the First Circuit described its inquiry as follows:

> [W]e must ask whether Blue Cross' conduct "went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill, and 'unnecessarily excluded competition'" from the health care insurance market. *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983).

*Ocean State, supra,* at 1110.

In contrast, the issue presented here is an alleged violation of § 1 of the Sherman Act, which requires a showing of: 1) concerted activity which 2) unreasonably restrains trade. *Standard Oil Co. v. United States,* 221 U.S. 1, 59–60, 31 S.Ct. 502, 515–16, 55 L.Ed. 619 (1911). As discussed earlier, the Government's allegations, if true, establish the first element. Moreover, the Government has not alleged a per se violation. Accordingly, the rule of reason analysis applies to the second element. *Continental T.V., Inc. v. Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). As stated above, under the "rule of reason" analysis, the Government must establish "that the anticompetitive effects of [Delta's Prudent Buyer clause] outweigh [the] legitimate business justifications." *Monahan's Marine, Inc. v. Boston Whaler Inc.,* 866 F.2d 525, 526–27 (1st Cir.1989). This analysis is fact-specific, requiring an examination of the anticompetitive effects of Delta's Prudent Buyer clause as compared to the clause's legitimate business benefits. This inquiry is more fact-intensive than the inquiry the First Circuit conducted in *Ocean State.* Because of the different inquiries involved, the First Circuit's decision in *Ocean State* does not necessarily control the decision here.

Moreover, here the Government has alleged that the effects of Delta's Prudent Buyer clause are anticompetitive. As the Magistrate noted in his Report and Recommendation, the *Ocean State* court may have canvassed the effects of Blue Cross' Prudent Buyer clause, but the "court did not undertake a searching inquiry into their severity, as would be appropriate under a § 1 rule of reason analysis, as such a claim was simply not before it." Magistrate's Report and Recommendation, at 21–22.

For example, in touching upon one alleged "effect" of Blue Cross' Prudent Buyer clause, the First Circuit noted Ocean State's asser-

tion that evidence on the record showed that Blue Cross' Prudent Buyer clause would have the effect of weakening or eliminating Ocean State. Ocean State pointed to evidence that Blue Cross directors expressed hopes of "emasculating Ocean State." *Ocean State, supra*, at 1113. The First Circuit responded that "the desire to crush a competitor, standing alone, is insufficient to make out a violation of antitrust laws." *Id.* at 1113.

Here, however, the Government alleges that Delta's Prudent Buyer policy adversely affects not just one existing competitor, but numerous existing and potential competitors. The Government further alleges that Delta's Prudent Buyer clause prevents many Rhode Island dentists from participating in lower cost programs, which pay dentists lower fees than Delta, because dentists fear that accepting lower fees from these programs will result in Delta reimbursing them at a lower rate. According to the Government:

> Faced with enforcement of Delta's MFN clause and the prospect of substantially lower payments for all of their Delta patients if they participate in a lower-cost plan, Delta participating dentists have either withdrawn from—or refused to join—lower-cost dental plans, or insisted as a condition of their participation that payments be increased to Delta's levels.

Memorandum of the United States in Opposition to Defendant's Objections to Report and Recommendation, at 8. The Government alleges that the ultimate effects of Delta's Prudent Buyer clause are threefold: (1) exclusion of potential competitors from the dental insurance market; (2) prevention of existing competitors from expanding their insurance programs; and (3) substantial increase in the costs of dental insurance and services to all Rhode Island consumers. Complaint ¶ 35. The Government, in its complaint, lists examples of these alleged negative effects. Complaint ¶¶ 19–29.

From this it is clear that the Government is not merely alleging that the effect of the Delta's Prudent Buyer clause is to eliminate one competitor, as was the case in *Ocean State*. Rather, the Government alleges that Delta's Prudent Buyer clause has a negative impact on all existing and potential compet-

ing plans, and ultimately, the consumer. Because *Ocean State* was decided pursuant to § 2 of the Sherman Act, and not § 1, the *Ocean State* court simply was not presented with, nor did the court assess, any allegations or evidence that Blue Cross' Prudent Buyer policy had the same anticompetitive effects as those alleged here.

*Ocean State* is distinguishable from the case here for another reason. In upholding Blue Cross' Prudent Buyer clause, the First Circuit noted that Blue Cross would save an estimated $1,900,000 through its policy. These estimated savings supported Blue Cross' contention that the Prudent Buyer policy was exactly what it was called—a policy prudently designed to save Blue Cross money by reducing the price it paid dentists for their services. Blue Cross's estimated savings from the Prudent Buyer clause suggested that the clause was procompetitive and not anticompetitive. Moreover, these estimated savings undermined Ocean States' claim that the Prudent Buyer policy was willfully employed by Blue Cross to maintain its monopoly power.

In the case at hand, however, the Government has alleged that:

> the MFN clause, by Delta's own admissions, has not generated any meaningful savings or other procompetitive benefits. Delta has not considered the MFN clause a cost-savings device, has not sought to calculate any savings from its application, and has not factored any such savings into determining the premiums it charges customers.

Complaint, ¶ 32. The lack of savings associated with Delta's Prudent Buyer clause suggests that it is not procompetitive. Further, the lack of savings suggests Delta's inability to assert any "legitimate business justifications" to outweigh any findings that the clause has "anti-competitive effects," as required under a "rule of reason" analysis. *Monahan's Marine, Inc. v. Boston Whaler Inc.*, 866 F.2d 525, 526–27 (1st Cir.1989).

In sum, for the reasons set forth in the Magistrate's Report and Recommendation, as well as the reasons stated above, I find that the Government has alleged facts suffi-

cient to overcome a Rule 12(b)(6) motion to dismiss regarding the "unreasonable restraint" on trade arising from Delta's Prudent Buyer clause.

### c. Delta's Remaining Objections To The Magistrate's Report And Recommendation Have No Merit

As stated above, the gravamen of Delta's objections to the Magistrate's Report and Recommendation concern the applicability of the First Circuit decisions *Kartell* and *Ocean State*. Having discussed these objections fully, I need address Delta's remaining objections only briefly.

■ Delta argues that the Magistrate's Report and Recommendation "erroneously concludes that Delta Dental's alleged 'market power' permits the Government to avoid dismissal under Rule 12(b)(6)," contrary to the First Circuit's opinion in *Kartell*. True, the First Circuit in *Kartell* found that Blue Cross' alleged market power did not make a "significant difference" to the outcome of the case. *Kartell, supra,* at 926. But in *Kartell,* the court found that market power was irrelevant because Blue Shield was doing nothing more than using its market power to obtain a low price for its enrollees. *Id.* at 928.

In this case, however, Delta's alleged market power is one important factor is assessing the *effects* of Delta's Prudent Buyer clause. As the Magistrate correctly noted in his Report and Recommendation, "the relevant focus in the present case turns precisely on the severity of the alleged anticompetitive effects flowing from the application of Delta's MFN clause juxtaposed against any competitive benefits." Magistrate's Report and Recommendation, at 22. The Magistrate also correctly concluded that a "generous reading of the government's Complaint reveals a plausible allegation that Delta possesses significant market power. Armed with this power, Delta applies its MFN clause selectively to block alternative reduced-fee plans from the dental insurance market, but has gained no discernible cost savings." Magistrate's Report and Recommendation, at 23.

In sum, unlike the situation in *Kartell*, the extent of Delta's market power is relevant here in discerning the effects that Delta's Prudent Buyer clause has on the dental insurance market.

Delta also objects to the Magistrate's Report and Recommendation on the grounds that the Magistrate "fails to disclose that its conclusions are inconsistent with the unanimous weight of authority on this issue elsewhere." Defendant Delta Dental of Rhode Island's Objections to the Magistrate's Report and Recommendation, at 3. Certainly, some of the cases Delta cites lend support to its argument. But for purposes of a Rule 12(b)(6) motion to dismiss, Delta's cases simply do not resolve the issue at hand.

For example, Delta cites *Blue Cross & Blue Shield of Michigan v. Michigan Association of Psychotherapy Clinics, et al.,* 1980 WL 1848 (E.D.Mich.1980) to support their position. In *Michigan Association,* defendants brought a Sherman Act counterclaim against plaintiffs alleging that plaintiffs' "non-discrimination clause"[6] constituted a per se violation of § 1 of the Sherman Act. The court held that the clause did not amount to illegal price fixing, noting that:

> [p]ractices that are not per se violative of the Sherman Act may be struck down under the rule of reason standard if they unduly restrain commerce ... However, the only antitrust violation alleged in the counterclaim is that the contracts between plaintiff and participating [providers] constituted price-fixing agreements; *defendants assert no other effect on price formation, or other type of restraint of trade, independent of what the contractual terms discussed above require.*

*Id.* at *3. Here, the Government has not alleged a per se violation of the Sherman Act. More importantly, the Government has alleged that Delta's Prudent Buyer clause has significant other effects on "price formation," and that the clause has the effect of restraining trade. *Michigan Association* defendants simply did not make the same allegations

---

**6.** Plaintiff's non-discrimination clause, as Delta notes in its memorandum in support of their objections to the Magistrate's Report and Recommendation, is similar to Delta's Prudent Buyer clause.

that the Government has made here. There-fore, *Michigan Association* is not directly on point, and simply does not resolve the issue presented here.

Delta also cites *E.I. Du Pont de Nemours & Co. v. FTC,* 729 F.2d 128, 139–140 (2d Cir.1984) as standing for the proposition that "use of MFN clauses is a legitimate business practice." Defendant Delta Dental of Rhode Island's Memorandum in Support of Its Ob-jections to Magistrate's Report and Recom-mendation, at 52. In *Du Pont,* petitioners DuPont and Ethyl challenged the Federal Trade Commission's finding that DuPont's and Ethyl's business practices, including their respective MFN policies, were anticom-petitive. Again, however, the *Du Pont* court resolved an issue different from the one pre-sented here. According to the *Du Pont* court, "[t]he essential question is whether, given the characteristics of the [specific] in-dustry, the Commission erred in holding that the challenged business practices constitute 'unfair methods of competition' in violation of § 5 [of the Federal Trade Commission Act] simply because they 'facilitate' consciously parallel pricing at identical levels." *Id.* at 135–36. Further, before rendering its deci-sion, the court thoroughly reviewed the Com-mission's findings and the evidence upon which the Commission relied, concluding that, "we do not find substantial evidence on this record, as a whole that the challenged practices significantly lessened competition ... or that the elimination of the those prac-tices would improve competition." *Id.* at 141. Thus, the court did not find that, as a matter of law, that the use of MFN clauses is a legitimate business practice. In fact, its de-cision suggests that a motion to dismiss in the case at hand would be improper, as courts must conduct a fact-specific inquiry to assess any anticompetitive effects of chal-lenged business practices. Thus, *Du Pont,* like *Michigan Association,* simply does not resolve the issue presented here.

Similarly, while *Kitsap Physicians Service v. Washington Dental Service,* 671 F.Supp. 1267 (W.D.Wash.1987), also cited by Delta, lends support to Delta's position, it is not controlling. In *Kitsap,* the court held that plaintiffs were not entitled to *preliminary injunctive* relief—finding that plaintiff did not "have a 'fair chance' of prevailing on the merits." *Id.* at 1269. Here, however, I do not consider whether the Government has a chance of succeeding on the merits, rather, I only decide whether "the allegations of the complaint permit relief to be granted on any theory ..." *O'Neil v. Q.L.C.R.I.,* 750 F.Supp. 551, 553 (D.R.I.1990).

*Blue Cross and Blue Shield United of Wisconsin v. Marshfield Clinic,* 65 F.3d 1406 (7th Cir.1995), cited by Delta, also fails to resolve the issue at hand. True, as Delta argues, in *Marshfield Clinic,* Chief Judge Posner came out strongly in favor of MFN clauses. But Posner did not hold, that as a matter of law, MFN clauses are valid absent predatory pricing. In fact, Posner conceded that, "[p]erhaps, as the Department of Jus-tice believes, these clauses are misused to anticompetitive ends in some cases; *but there is no evidence of that in this case.*" *Id.* at 1415 [emphasis added]. Here, the Govern-ment alleges facts to support the contention that Delta's Prudent Buyer clause is "mis-used to anticompetitive ends."

Finally, Delta cites *Willamette Dental Group, P.C. v. Oregon Dental Service Corpo-ration,* 130 Or.App. 487, 882 P.2d 637 (1994) to support its argument. *Oregon Dental* is factually similar to *Ocean State; Oregon Dental* plaintiffs brought claims against den-tal service providers, claiming that defen-dants' MFN clause violated state antitrust laws almost identical to § 2 of the Sherman Act.[7] The *Oregon Dental* court rejected de-fendant's argument that "as a matter of law, enforcement of a most favored nations clause can never constitute predatory pricing." *Id.,* 882 P.2d at 642. In so doing, the court criticized *Ocean State,* noting that the *Ocean State* court invoked an efficiency rationale, and finding that *Ocean State's:*

consideration of economic efficiency, al-though accurate in many respects, is hard-ly conclusive. In this context, preoccupa-tion with economic efficiency is almost tautological. A purchaser's enforcement

---

**7.** In fact, the *Oregon Dental* court "look[ed] to federal decisions interpreting section 2 of the Sherman Act for persuasive ... guidance." *Ore-gon Dental, supra,* 882 P.2d at 640.

of a most favored nations clause will always be "efficient" in the sense that the purchaser will pay less for good or services than it would have otherwise. *We note, moreover, the possibility that, is some circumstances, the enforcement of most favored nations clauses can have severe anticompetitive effects.* Such clauses may

> "(1) eliminate a dynamic mechanism by which prices are racheted down to the competitive level; (2) reduce [output of medical services]; and (3) prevent the market from rewarding more efficient distribution systems." Celnicker, "A Competitive Analysis of Most Favored Nations Clauses in Contracts Between Health Care Providers and Insurers," 69 NCLRev 863, 884 (1991).

*Id.*, 882 P.2d at 642–43 [emphasis added]. Thus, *Oregon Dental* undermines Delta's position, and stands for the proposition that courts should not adopt a per se rule regarding MFN clauses, but should carefully examine the alleged anticompetitive effects of each challenged clause.

It is true, as Delta argues, that the *Oregon Dental* court subsequently upheld the validity of the challenged MFN clause, noting that there "is no evidence in the record that [defendant]'s enforcement of [the MFN clause] has unreasonably excluded competition." *Id.* It is also true, as Delta points out, that the court found that "there was no meaningful distinction between the facts of [*Ocean State* ] and this case." *Id.*, 882 P.2d at 642. However, as discussed earlier, there are notable distinctions between the case at hand and *Ocean State*. Thus, the fact that the *Oregon Dental* court upheld a Prudent Buyer clause in a case factually similar to *Ocean State* does not mean that the *Oregon Dental* court would uphold Delta's Prudent Buyer clause based on the facts alleged here. Delta simply cannot rely on *Oregon Dental* to control the matter here, and, in fact, *Oregon Dental* favors the Government's position.

## CONCLUSION

For all the reasons set forth in the Magistrate's Report and Recommendation, in addition to the reasons set forth above, I fully accept the Magistrate's Report and Recommendation. Accordingly, I deny defendant's Motion to Dismiss for failure to state a claim upon which relief can be granted.

SO ORDERED.

## REPORT AND RECOMMENDATION

LOVEGREEN, United States Magistrate Judge.

Presently before me is the defendant's, Delta Dental of Rhode Island ("Delta"), motion to dismiss a civil complaint brought by the United States of America ("the government"). Fed.R.Civ.P. 12(b)(6). The government has instituted this action for injunctive relief claiming that Delta has violated § 1 of the Sherman Act. 15 U.S.C. § 1. This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B) and Local Rule of Court 32(c). A hearing was held on June 5, 1996. After listening to the arguments of counsel and examining the memoranda submitted, I recommend that Delta's motion to dismiss be denied.

### Facts

This case arises out of recent efforts by the United States Department of Justice to try and limit the application and perceived anticompetitive effects of contractual provisions termed "Most Favored Nation" clauses or "Prudent Buyer Policies," which are particularly prevalent in the health care field. *See* 66 *Antitrust & Trade Reg.Rep.* (BNA) No. 1651 (Feb. 17, 1994). This is, however, one of the first opportunities that such a clause has been subjected to judicial scrutiny as an unreasonable restraint of trade in violation of § 1 of the Sherman Act. *cf., Blue Cross and Blue Shield of Ohio v. Bingaman,* CN 1:94 CV 2297, 1996 WL 677094 (N.D.Ohio June 24, 1996) (rejecting contention that Antitrust Division of Justice lacked jurisdiction for civil investigation because MFN clauses do not, as a matter of law, violate the Sherman Act).

As this matter comes before the Court in the posture of a motion to dismiss, the Complaint's factual allegations must be portrayed in the light most favorable to the government. *Negron–Gaztambide v. Hernandez–*

*Torres,* 35 F.3d 25, 27 (1st Cir.1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 1098, 130 L.Ed.2d 1066 (1995). Delta, a Rhode Island not-for-profit corporation with its principal place of business in Providence, Rhode Island, underwrites and administers group dental care insurance plans for employers and other group purchasers located primarily in Rhode Island. According to the government's Complaint, Delta, as the state's largest dental insurer, insures or administers plans for 35–45% of persons covered by any type of dental insurance in Rhode Island. Compl. ¶ 8. Moreover, 90% of the dentists actively practicing in Rhode Island accept Delta. *Id.*

By participating in Delta, each dentist agrees to accept payments from Delta, in addition to any deductible or co-payment by the patient, as full payment for covered services. Each participating dentist further agrees to comply with Delta's Participating Dentist's Agreement, which incorporates by reference Delta's Rules and Regulations (collectively "the Agreement"). The Agreement, among other things, dictates the fees that participating dentists receive for treating Delta subscribers. The specific fee provision at issue in this case is Rule 10, which provides as follows:

> "Delta Dental reserves the right to limit reimbursements to dentists to such levels as such dentists have agreed to accept from other non-governmental dental benefit reimbursement programs."

Compl. ¶ 12.

According to the government, Delta enforces this "Most Favored Nation" clause ("MFN clause") "whenever the fees that a participating dentist accepts from another non-governmental third-party payer are 'demonstrably significantly lower than (Delta's).'" Compl. ¶ 13. Moreover, the government alleges that Delta applies this provision even when participating dentists accept reduced fees from *uninsured* patients. Compl. ¶ 15. In either case, after determining that such fees are "demonstrably significantly lower," Delta allegedly examines several factors before applying its MFN clause: whether the disparity between fees will be eliminated quickly by the competing plan, the

administrative costs Delta incurs applying its MFN clause and whether Delta can eliminate such a fee differential through managing the use of dental services. Compl. ¶ 13. Rule 7 of the Agreement provides Delta with significant enforcement power allowing it to audit the records of any participating dentist to review "'fees charged and collections made with respect to non-subscriber patients....'" Compl. ¶ 14.

As a result of Delta's significant share of insured dental patients in Rhode Island, the government contends that the MFN clause imposes a stiff financial penalty on participating dentists who want to charge fees substantially lower than Delta. Compl. ¶ s 16–18. This financial penalty allegedly impedes the ability of existing competing plans to contract with most Rhode Island dentists at fees substantially lower than Delta's. Compl. ¶ 17. It also makes it significantly more difficult for new plans to find sufficient dentists to serve potential subscribers at reduced rates, thereby acting as a barrier to market entry. Compl. ¶ 18. Consequently, the government avers that participating dentists either disaffiliate from or refuse to join alternative dental plans offering fees less than Delta's or insist that the alternative plans match Delta's higher reimbursement levels. As a result, "Delta's MFN clause has deprived consumers of the benefits that discounted fee plans can offer: increased competition, lower premiums, and greater availability of dental care." *Id.*

As concrete examples of the anticompetitive effects of Delta's MFN clause, the government points to Blue Cross and Blue Shield of Massachusetts's experience with its Dental Blue preferred provider organization ("Dental Blue"). In the Fall, 1993, Dental Blue was established for employees, and their families, of Raytheon Corporation's Portsmouth, Rhode Island facility. Compl. ¶ 19. Dental Blue contracted with area dentists, all of whom participated in Delta, at substantially reduced fees. Delta calculated such payments would be 14% lower, on average, than the fees it paid to participating dentists. Compl. ¶ 20. In response, Delta allegedly adopted a three prong counter attack: 1) contact the Rhode Island Dental

Association ("RIDA") regarding Dental Blue; 2) apply its MFN clause to Dental Blue dentists, all of whom participated in Delta; and 3) develop its own participating provider organization. Compl. ¶ 21.

The government contends Delta achieved its first objective by contacting the chairman of the RIDA's Council on Dental Programs, who subsequently issued a letter to participating Delta dentists warning them to "be aware that your decision (to accept fees lower than Delta) may have severe financial penalties." Compl. ¶ 22. Delta next allegedly contacted dentists in Dental Blue, all of whom participated in Delta, of its intent to apply its MFN clause. Compl. ¶ 23. As a result, the government avers that all of the Dental Blue dentists contacted by Delta disaffiliated from Dental Blue. Compl. ¶ 24. Moreover, the government alleges that Dental Blue's resultant failure allowed Delta to postpone indefinitely its planned third response of developing its own limited-panel, reduced-fee participating provider organization. Compl. ¶ 26.

The government further asserts that Delta's MFN has caused "dentists to disaffiliate from or refuse to join a dental insurance plan—established by Dental Benefit Providers, Inc., on behalf of Harvard Community Health Plan—until the plan increased its payments to the levels paid by Delta." Compl. ¶ 28. Additionally, the fear instilled in participating Delta dentists by the MFN clause has allegedly prevented United States Health Care, a new competing dental provider, from offering a discounted dental plan, as the company has failed to contract with dentists in Rhode Island. Compl. ¶ 29. Moreover, two other reduced-fee dental insurance plans have contracted with participating Delta dentists, but are fearful to expand their dental provider network for fear of detection by Delta and the inevitable application of its MFN clause. Compl. ¶ 27. Lastly, the government contends that Delta's persistent application of its MFN clause will continue to deter low-cost dental plans' entry into Rhode Island, while limiting lower cost expansion of existing plans, thereby depriving consumers of the benefits yielded from increased competition. As a consequence of these alleged

substantial anticompetitive effects on the Rhode Island dental services market, the government has instituted suit under § 1 of the Sherman Act seeking injunctive relief.

*Discussion*

I. *Fed.R.Civ.P. 12(b)(6) Standard.*

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of an action if that action fails to state a claim upon which relief can be granted. The First Circuit Court of Appeals has recognized a tension among precedents regarding the particularity of pleading required to overcome a Rule 12(b)(6) motion and has noted that "the degree of specificity with which the operative facts must be stated in the pleadings varies depending on the case's context." *Boston & Maine Corp. v. Town of Hampton,* 987 F.2d 855, 863 (1st Cir.1993) (quoting *U.S. v. AVX Corp.,* 962 F.2d 108, 115 (1st Cir.1992)).

In deciding a Rule 12(b)(6) motion, "the court must accept the well-pleaded factual averments of the ... complaint as true, and construe these facts in the light most flattering to the [plaintiff's] cause...." *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir. 1988) (quoting *Chongris v. Board of Appeals,* 811 F.2d 36, 37 (1st Cir.), *cert. denied,* 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 765 (1987)). Further, "the Court must deny a motion to dismiss if the allegations of the complaint permit relief to be granted on any theory, even one not expressly stated therein." *O'Neil v. Q.L.C.R.I.,* 750 F.Supp. 551, 553 (D.R.I.1990). "Nevertheless, minimal requirements are not tantamount to nonexistent requirements." *Gooley v. Mobil Oil Corp.,* 851 F.2d at 514. "[A] plaintiff ... is ... required to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Id.* at 515.

In connection with run-of-the-mine motions brought under Rule 12(b)(6), a reviewing court is obliged neither to "credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions or outright vituperation," nor to honor subjective characterizations, optimistic predictions or problematic suppositions. "[E]mpirically

unverifiable" conclusions, not "logically compelled, or at least supported by the stated facts," deserve no deference. *U.S. v. AVX Corp.,* 962 F.2d at 115 (citations omitted). "It is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that 'conclusions' become 'facts' for pleading purposes." *The Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989).

## II. *Section I of the Sherman Act: General Principles.*

Section 1 of the Sherman Act, 15 U.S.C. § 1, states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Recognizing that any agreement concerning trade restrains competition, the Supreme Court has interpreted § 1 to render unlawful only those restraints of trade that unreasonably restrict competition. *Standard Oil Co. v. United States,* 221 U.S. 1, 52, 31 S.Ct. 502, 512, 55 L.Ed. 619 (1911). As a consequence, § 1 jurisprudence demands three elements be alleged with sufficient clarity to withstand a motion to dismiss: (1) the existence of a contract, combination or conspiracy among two or more separate entities that (2) unreasonably restrains trade and (3) affects interstate or foreign commerce. *See id.*

There is no dispute that Delta's alleged conduct affects interstate commerce. Delta, however, contends that the government's Complaint fails to allege unlawful "concerted action" and further argues that its MFN clause does not unreasonably restrain trade. Each of these arguments will be addressed *in seriatim.*

### A. Concerted Action.

Delta contends initially that the government's Complaint fails to allege an unlawful agreement in violation of § 1. Specifically, Delta avers that it unilaterally adopted its MFN clause and that in turn, each participating dentist agreed simply to accept Delta's terms. Consequently, it argues that there is no concerted action to implicate § 1. Taking a somewhat different tact, Delta further argues that "the mere existence of a contractual relationship between Delta Dental and each of its participating dentists does not amount to *unlawful* concerted action...." Def.'s Memo. in Support of its Mot. to Dismiss at 35 (emphasis added).

Although the Supreme Court has recognized that § 1 does not reach conduct that is "wholly unilateral," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984), concerted action may be amply demonstrated by an express agreement. *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 213–18, 20 S.Ct. 96, 97–99, 44 L.Ed. 136 (1899). Here, there is no dispute that each participating dentist agrees explicitly to comply with Delta's Participating Dentist's Agreement, which incorporates by reference Delta's Rules And Regulations, including the MFN clause at issue. Thus, every contract between Delta and a participating dentist contains the MFN clause at issue. As a result, the requisite concerted action has clearly been alleged.

Moreover, Delta's alternative contention that the mere contractual relationship between it and participating dentists does not amount to *unlawful* concerted action simply confuses the relevant analysis by fusing the concerted action and unreasonable restraint of trade requirements necessary to establish a § 1 violation. Consequently, since the agreement between Delta and its participating dentists clearly alleges concerted action, the inquiry now shifts to whether such action unreasonably restrains trade.

### B. Unreasonable Restraint of Trade Requirement.

As noted, the Supreme Court has read § 1 as prohibiting only unreasonable restraints of trade. *Standard Oil Co.,* 221 U.S. at 69–70, 31 S.Ct. at 519–20. Whether an agreement has unreasonably restrained trade has traditionally been determined by use of one of two methods of analysis. Where a "practice facially appears to be one that would always or almost always tend to restrict competition and decrease output" as opposed to "one

designed to 'increase economic efficiency and render markets more, rather than less, competitive,'" it is deemed to be "per se illegal," *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562–63, 60 L.Ed.2d 1 (1979), without regard to a defendant's market power, illicit purpose and the agreement's anticompetitive effects. *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 593 (1st Cir.1993). Such *per se* unreasonable restraints include horizontal price-fixing and market allocation agreements among competitors. *See, e.g., Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49, 111 S.Ct. 401, 402, 112 L.Ed.2d 349 (1990) (market allocation agreements); *Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 354, 102 S.Ct. 2466, 2478, 73 L.Ed.2d 48 (1982) (horizontal price-fixing). In the present case, however, the government has not alleged that Delta's MFN clause is *per se* unreasonable.

Thus, Delta's MFN clause must be subjected to the second traditional type of analysis commonly referred to as the "rule of reason." *Continental T.V., Inc. v. Sylvania, Inc.*, 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). Under such an analysis, a plaintiff has the burden of establishing "that the anti-competitive effects of the agreements outweigh their legitimate business justifications." *Monahan's Marine, Inc. v. Boston Whaler Inc.*, 866 F.2d 525, 526–27 (1st Cir.1989). Such an inquiry is limited to determining the market impact of the restraint on competition. *Nat'l. Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 691 n. 17, 98 S.Ct. 1355, 1365 n. 17, 55 L.Ed.2d 637 (1978).

Understandably, the Supreme Court has yet to enunciate a detailed analytical framework for determining whether a particular restraint of trade unreasonably restricts competition under § 1's rule of reason. It is clear, however, that an agreement is not unreasonable merely because it injures a competitor, *Brown Shoe Co. v. United States*, 370 U.S. 294, 319–20, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), but rather assumes such a cast only when it causes detriment to the competitive process. *Clamp–All Corp. v. Cast Iron Soil Pipe Institute*, 851 F.2d 478, 486 (1st Cir.1988). Courts undertaking a rule of reason inquiry consider such diverse factors as: the defendant's intent and purpose for adopting the practice; the structure and competitive circumstances within the relevant market; the relevant competitive strengths of the defendants; the existence of economic hurdles undermining a competitor's ability to counteract the challenged practice; and the legitimate economic justifications for the practice. *See* William C. Holmes, *Antitrust Handbook* § 1.04[2], at 223–24 (1996 ed.). No single factor, however, predominates over the others. *Id.*

In the present case, the parties divergent views over the reasonableness of Delta's MFN clause are rooted in their respective interpretations of the First Circuit's decisions in *Kartell v. Blue Shield of Massachusetts, Inc.*, 749 F.2d 922 (1st Cir.1984), *cert. denied*, 471 U.S. 1029, 105 S.Ct. 2040, 2049, 85 L.Ed.2d 322 (1985), and *Ocean State Physicians Health Plan v. Blue Cross and Blue Shield of Rhode Island*, 883 F.2d 1101 (1st Cir.1989), *cert. denied*, 494 U.S. 1027, 110 S.Ct. 1473, 108 L.Ed.2d 610 (1990). Delta contends that these decisions stand for the straightforward proposition that MFN clauses, absent pricing that is predatory or below incremental cost, are competitive as a matter of law. Moreover, even as applied to the anticompetitive effects alleged in the instant case, Delta argues that its MFN clause withstands scrutiny under a rule of reason analysis. The government counters that while these decisions may validate Delta's MFN clause as written, the clause's specific application constitutes an unreasonable restraint of trade under § 1 by sustaining dental service prices; foreclosing opportunities for reduced-fee, alternative dental plans; and inhibiting existing plans' ventures into lower cost alternatives. Given the prominence of these decisions in deciding the present issue and the parties incompatible interpretations, each will be addressed in considerable detail.

### 1. *Kartell.*

*Kartell* involved a claim by physicians that Blue Shield of Massachusetts, Inc.'s ban on balance billing, whereby Blue Shield paid participating physicians only if they agreed not to charge subscribers any additional fees,

violated §§ 1 and 2 of the Sherman Act. The district court determined that Blue Shield provided coverage for about 74% of all Massachusetts' residents with private health insurance, nearly all Massachusetts's practicing doctors accepted Blue Shield and Blue Shield payments accounted for about 13% to 14% of all "'physician practice revenue.'" 749 F.2d at 924. The lower court concluded that based on the large number of Blue Shield subscribers, doctors were under "'heavy economic pressure'" to accept Blue Shield and agree to the company's payment system. *Id.* Consequently, it held that the physicians' inability to balance bill and the size and buying power of Blue Shield resulted in unreasonably rigid and unjustifiably low fees in violation of § 1.

On appeal the First Circuit reversed undertaking a three tier analysis. After determining initially that Blue Shield was acting merely as a buyer in these circumstances, the First Circuit reiterated general antitrust principles stating that the "law rarely stops the buyer of a service from trying to determine the price or characteristics of the product that will be sold." *Id.* at 925. Even assuming that Blue Shield possessed significant market power and used such power to obtain lower than competitive prices, the court observed that "antitrust laws interfere with a firm's freedom to set even uncompetitive prices only in special circumstances, where, for example, a price is below incremental cost (or predatory)." *Id.* at 927. The court then noted that there was no finding below, or even allegation on appeal, that Blue Shield's actions were predatory or below incremental cost. *Id.* at 928.

In its second tier of analysis, the court responded to the alleged harmful effects produced by the ban, including: virtual elimination of price competition for services covered by Blue Shield, dissuading new doctors from entering the market due to low reimbursements and discouraging doctors from giving other non-Blue Shield patients lower prices. *Id.* at 929. Reiterating its earlier conclusion, the court observed "that normally the choice of what to buy and what to offer to pay is the buyer's. And, even if the buyer has monopoly power, an antitrust court (which might, in appropriate circumstances, restructure the market) will not interfere with a buyer's (nonpredatory) determination of price." *Id.* at 929. As the court noted, "[a] legitimate buyer is entitled to use its market power to keep prices down." *Id.*

In its final tier of analysis, the court stated that its conclusion was also compelled by three additional factors. First, the prices at issue were low prices not high prices. The plaintiff-physicians' central complaint was that Blue Cross's ban, combined with its market power, kept the doctors' fees too low. Such a distinction was important to the *Kartell* court because "the Congress that enacted the Sherman Act saw it as a way of protecting consumers against prices that were too *high*, not too low." *Id.* at 931. Moreover, "the relevant economic considerations may be very different when low prices, rather than high prices, are at issue." *Id.* Second, the court noted that the area of medical costs is one of "great complexity where more than economic values are at stake" and, lastly, that the price system in question was regulated by the state. *Id.* For all these reasons, the court concluded that Blue Shield's ban on balance billing failed to constitute an unreasonable restraint of trade in violation of § 1.

### 2. *Ocean State.*

While *Kartell* dealt with a §̇ 1 claim but not a MFN clause, *Ocean State* by contrast primarily involved a § 2 challenge to a MFN clause identical to the one at issue in the present case.[1] In the First Circuit's latter decision, Ocean State Physicians Health Plan, Inc. and a certified class of participating Ocean State physicians brought suit under §§ 1 and 2 claiming Blue Cross & Blue Shield of Rhode Island acted unlawfully to exclude Ocean State from the health care insurance marketplace. Following a jury verdict for plaintiffs on their § 2 claim, the

---

1. Section 2 of the Sherman Act, 15 U.S.C. § 2, provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony...."

district judge granted judgment notwithstanding the verdict for Blue Cross determining that the challenged conduct in question was legitimate competitive activity.[2]

At trial it was established that Blue Cross was the largest health insurer in Rhode Island when Ocean State was formed in 1984. 883 F.2d at 1103. Yet, because of its lower premiums and greater coverage than Blue Cross, Ocean State expanded rapidly causing Blue Cross, by 1986, to lose 30,000 subscribers. *Id.* Blue Cross responded by forming its own HMO, introducing an "adverse selection policy" and instituting a MFN clause. *Id.* at 1103–04. The MFN clause was in response to Ocean State's practice of paying physicians 20% less for similar services than Blue Cross. *Id.* at 1104. As a direct result of the MFN clause, 350 of Ocean State's 1200 physicians resigned, presumably to avoid reduced fee payments. *Id.*

In beginning its analysis, the court framed the issue as "whether Blue Cross *maintained* its monopoly position through improper means" in violation of § 2.[3] 883 F.2d at 1110. The court then observed that § 2 prohibits " 'exclusionary' conduct by a monopoly, often defined as 'behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way.' " *Id.* (quoting 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 626b at 78). The court concluded, contrary to plaintiffs' contentions, that the MFN clause "was a bona fide policy to ensure that Blue Cross would not pay more than any competitor for the same services." 883 F.2d at 1110. Agreeing with the district court, the First Circuit stated that the MFN clause's insistence on a supplier's lowest price, absent pricing that is either predatory or below the supplier's incremental cost, "tends to further competition on the merits and, as a matter of law, is not exclusionary." *Id.* According to the court, such a conclusion

was compelled by *Kartell's* pronouncement that a buyer's decision concerning price bargains, absent predatory pricing or pricing below incremental cost, even with monopoly power, does not violate the Sherman Act. *Id.*

The First Circuit further noted that two of the additional considerations underpinning *Kartell's* refusal to invalidate the price bargain in that case were also present: *Kartell's* admonition that where the issue concerns low prices, rather than high prices, a court should be wary to invalidate a price bargain and *Kartell's* reluctance to interfere in the vastly complex arena of medical costs, where a confluence of differing values merge. *Id.* at 1111.

Finally, the court addressed plaintiffs' argument that even assuming that the MFN clause as written was legitimate, its application was directed specifically at destroying Ocean State. Even assuming that Blue Cross engaged in such a practice, the court noted that it was "primarily Ocean State physicians that were selling their services at a lower price to another provider (Ocean State) than to Blue Cross." *Id.* at 1112. Just as importantly, the court found that Blue Cross's desire, expressed through its executives, to "emasculate Ocean State" was alone too vague a standard to support a § 2 violation. *Id.* at 1113. Consequently, Blue Cross's MFN clause, along with its other challenged practices, was held not to violate § 2.

### III. *Applying Kartell and Ocean State.*

Without doubt, when Delta contracts with dentists it is acting as a purchaser of dental services. *Ocean State,* 883 F.2d at 1111; *Kartell,* 749 F.2d at 925–26. As such, it has wide latitude to obtain the lowest possible prices for the services it purchases. *Id.* Delta's utilization of a MFN clause, ostensibly to ensure price bargains with sellers re-

---

**2.** Previously, at the close of plaintiff's case, the district court directed a verdict in favor of Blue Cross on plaintiffs' § 1 claims, which were wholly unrelated to the MFN clause.

**3.** Technically, a buyer's substantial power over price and market entry is referred to as "monopsony power" as distinguished from a seller's mo-

nopoly power. *See In re Beef Indus. Antitrust Litig.,* 907 F.2d 510, 514–16 (5th Cir.1990). However, the relevant inquiry remains virtually identical and thus, explains the First Circuit's use of the term "monopoly power" throughout *Ocean State.*

main competitive, would appear to fit within the latitude afforded by *Kartell* and *Ocean State,* given the absence of any allegation that Delta's pricing has been predatory or below incremental cost. 883 F.2d at 1110–11; 749 F.2d at 927.

As *Kartell* instructs, "antitrust laws interfere with a firm's freedom to set even uncompetitive prices only in special circumstances, where, for example, a price is below incremental cost." 749 F.2d at 928. Whether or not such a price bargain is "unreasonable" is legally irrelevant "even in the case of a monopoly." *Id.* at 929. As the *Ocean State* Court observed in upholding the validity of an identical MFN clause from a § 2 challenge, "such a policy of insisting on a supplier's lowest price—assuming that the price is not 'predatory' or below the supplier's incremental cost—tends to further competition on the merits and, as a matter of law, is not exclusionary." *Id.* at 1110. Whatever ambiguity that *Kartell* and *Ocean State* engender, both decisions reflect unequivocally the First Circuit's distaste for interfering with a buyer's price bargain, absent compelling circumstances.

Yet, the government contends its Complaint strikes not at the price bargain between Delta and its participating dentists *per se,* but rather challenges the MFN clause's application due to its alleged anticompetitive effects, which purportedly outweigh the clause's competitive benefits. Conceding that *Kartell* and *Ocean State* validate Delta's MFN clause as written, the government responds that these decisions neither stand for a blanket condonation of all such clauses under any circumstance absent pricing that is predatory or below incremental cost, nor validates the clause's application as a reasonable restraint of trade on the facts of this case.

## A. Per se Rule.

Despite *Kartell* and *Ocean State's* broad language, these decisions, properly construed, fail to establish a *per se* validation of MFN clauses in all cases where pricing is not predatory or below incremental cost. Such a blanket condonation of MFN clauses would ignore the context *Kartell* and *Ocean State*

were decided in, run counter to the Sherman Act's preference for fact-specific inquiries, implausibly reject the premise that MFN clauses produce substantial anticompetitive effects in particular circumstances and contradict the Sherman Act's animating concern for low consumer prices.

### 1. *Differing Contexts.*

*Kartell* involved a § 2 claim but did not deal with a MFN clause, while *Ocean State* addressed the validity of a MFN clause solely under § 2. Here Delta's MFN clause is being challenged strictly under § 1's rule of reason, which, absent limited *per se* exceptions not alleged here, requires a fact intensive inquiry.

Delta, however, argues that the distinction between §§ 1 and 2 of the Sherman Act poses no obstacle to the application of *Ocean State's* holding to the present case. Delta posits that the First Circuit considered specifically the exclusionary effects of Blue Cross's MFN clause in reaching its holding in *Ocean State,* effects that are allegedly more anticompetitive than the ones averred by the government in the instant case. As Delta avers "it makes no sense to conclude that the imposition of Prudent Buyer by a company with monopoly power cannot violate Section 2, but the imposition of the same policy by a company without monopoly power can violate section 1." Def's Reply Memo. at 14.

*Ocean State* reached the First Circuit from the district court's grant of judgment notwithstanding the verdict for Blue Cross on a § 2 claim based on plaintiff's failure to demonstrate Blue Cross's actions were anything but legitimate acts of competition. Thus, the primary issue confronting the First Circuit on appeal was whether the trial court's ruling was correct, that is: whether the challenged practice " 'went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill and unnecessarily excluded competition from the health care industry.' " 883 F.2d at 1110 (quoting *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230 (1st Cir.1983)). While the First Circuit certainly canvased the effects of Blue Cross's MFN clause as Delta contends, the

court did not undertake a searching inquiry into their severity, as would be appropriate under a § 1 rule of reason analysis, as such a claim was simply not before it.

By contrast, the relevant focus in the present case turns precisely on the severity of the alleged anticompetitive effects flowing from the application of Delta's MFN clause juxtaposed against any competitive benefits. Delta's reading of *Ocean State* would render the only distinction between §§ 1 and 2: whether a monopoly or concerted action was involved. Although the precise differences between the two sections are murky, they clearly diverge in more than this respect. *See, e.g., Copperweld,* 467 U.S. at 768, 104 S.Ct. at 2740 (noting that § 2's standard is less stringent than § 1 because it is difficult for a court to distinguish between vigorous competition and anticompetitive conduct when analyzing the actions of a single firm).

Moreover, while Delta counters that the differences in the present case are semantical, they highlight the fact that *Ocean State's* pronouncement about the validity of Blue Cross's MFN clause was made in a specific factual context under a legal provision not at issue here. The *per se* rule Delta urges would cut a wide swath through the heart of § 1's case by case rule of reason analysis ignoring the Supreme Court's admonition that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Serv., Inc.,* 504 U.S. 451, 466–67, 112 S.Ct. 2072, 2081–83, 119 L.Ed.2d 265 (1984). The government's allegations demonstrate the dangers of adopting such an approach.

A generous reading of the government's Complaint reveals a plausible allegation that Delta possesses significant market power. Armed with this power, Delta applies its MFN selectively to block alternative reduced-fee plans from the dental insurance market, but has gained no discernible cost savings. Additionally, such a practice has sustained or increased consumer dental costs in the form of premiums. Thus, Delta's use of its MFN clause has had an allegedly negative market impact without any perceivable competitive benefits. Although the govern-

ment may have trouble proving the severity of these alleged effects, nonetheless, at this stage of the litigation, these allegations highlight the possible detrimental, anticompetitive effects that the selective use of a MFN clause can have on a relevant market and the resulting need to approach these fact driven situations on a case by case basis, rather than with a sweeping *per se* rule.

Furthermore, a blanket rule validating MFN clauses in all contexts devoid of pricing that is predatory or below incremental cost would rest on the implausible premise that, in such cases, a MFN clause's anticompetitive effects are always *de minimis* when compared to its competitive benefits. Such a premise simply can not stand. As set forth above, the government's allegations provide a fact-specific example exposing the flaw in such reasoning. Moreover, it has been generally pointed out that in given circumstances, not limited to those where pricing is predatory or below incremental cost, MFN clauses "discourage discounting, facilitate oligopolistic pricing, and deter entry or expansion by more efficient distribution systems." Arnold Celnicker, "A Competitive Analysis of Most Favored Nation Clauses in Contracts Between Health Care Providers and Insurers," 69 North Carolina Law Review 863, 891 (1991).

### 2. *Low vs. High Prices.*

Additionally, the First Circuit's hesitancy in interfering in price bargain agreements in both *Kartell* and *Ocean State* occurred in the context of lower consumer prices. Within this specific context, both cases held that a purchaser's legitimate decision to seek the lowest price bargain, absent pricing that is predatory or below incremental cost, does not violate the antitrust laws as a matter of law. This is a very different scenario than the instant case, where the government alleges Delta's MFN clause has led to higher or at least sustained consumer prices.

Delta counters that the government's attempt to distinguish the present case on the basis of high prices "is nothing more than semantics designed to apply a more pejorative adjective ("high") to the word 'price.'" Delta's Reply Memo. at 26. In Delta's view,

its MFN clause does not prohibit participating dentists from charging lower or higher prices to non-Delta subscribers. While Delta's contentions may prove true, the government alleges that the MFN clause's *effects*, magnified by Delta's market power, have been to freeze out reduced fee plans from the market, prevent existing plans from offering lower fee options and, as a result, keep prices *higher* than would be without the clause.

Clearly, low consumer prices were a sufficiently animating concern in both *Kartell* and *Ocean State* to further militate against now extending *Ocean State's* broad pronouncement about MFN clauses to the present case. Each decision involved a situation where the consumer, at least some segment thereof in theory, benefited from lower prices.[4] Moreover, both decisions highlighted the Sherman Act's fundamental focus of protecting consumers from high prices and observed that the considerations relevant where low prices are involved may be very different than in a high price context. 883 F.2d at 1111; 749 F.2d at 931.

Blindly extending *Kartell* and particularly *Ocean State's* broad language to the instant case in the form of a *per se* rule, where the government's driving allegations rest on market foreclosure of reduced fee plans, the inability of existing plan from offering lower fee alternative options and the sustenance or increase of consumer prices, would eviscerate much of the persuasive rationale of both decisions. Moreover, such validation, without regard to effects on the consumer, would be an overly simplistic and rigid approach to an area of vast complexity, ignore the realities of the perpetual evolution of modern business practices and contradict the Sherman Act's animating concern of protecting consumers from high prices.

## B. Government's Complaint Under the Rule Of Reason.

Whether the government has stated a claim under § 1 of the Sherman Act thus turns on an examination of the salient factors that collectively comprise the rule of reason. Because this case is before the Court on a motion to dismiss, the government's allegations must be taken as true and construed in the light most flattering to the plaintiff's cause.

As noted, under the rule of reason the plaintiff has the burden of alleging "that the anti-competitive effects of the agreements outweigh their legitimate business justifications." *Monahan's Marine, Inc.*, 866 F.2d at 526–27. Although a Court weighs a number of different factors to reach such a determination, no one single factor is dispositive. Moreover, because this is a motion to dismiss, the legitimacy of Delta's business justifications are not properly before this Court. These justifications way very well undermine the government's allegations, but at this point they are simply irrelevant to the present analysis of whether, within the four corners of the government's Complaint, a cause of action has been stated under § 1.[5] Additionally, the rule of reason by its very nature is particularly fact intensive not lending itself to neat resolution by a dispositive motion.

---

4. In *Kartell*, Blue Shield's ban on balance billing clearly saved its subscribers from incurring additional provider costs. The situation in *Ocean State*, however, is a bit less clear. Curiously, in footnote 11, the *Ocean State* court responded to plaintiff's contention that Blue Cross never actually passed along savings from use of its MFN clause to subscribers stating, ". . . nothing turns on whether Blue Cross in fact lowered its rates. The fact remains that achieving lower costs is a legitimate business justification under the anti-trust laws." 883 F.2d at 1111 n. 11. Not only is such a contention unduly severe, but more importantly contradicts both the Sherman Act's focus on lower consumer prices and the *Ocean State* court's *own* reliance on such a concern. In fact, in the paragraph following this footnote, the court favorably quotes *Kartell's* admonition that

"'courts . . . should be . . . reluctant to condemn too speedily . . . an agreement that, on its face, appears to bring lower price benefits to the consumer,'" *Id.* at 1111 (quoting *Kartell* at 930–31), and notes that such a consideration was also "*relevant to the present case as well.*" *Id.* at 1111 (emphasis added).

5. For example, Delta contends that the total number of dentists who disaffiliated from Dental Blue due to the threat of Delta's MFN clause was five or six. Certainly, such a contention, if true, helps undermine the government's allegation that Delta's MFN clause has produced substantial anticompetitive effects, but, at this juncture, the focus rests solely on the government's Complaint.

**192**

Although not specifically alleged, a flattering reading of the government's Complaint reveals a *plausible* allegation that Delta possesses significant market power due to its 35–45% share of the dental insurance market and the fact that 90% of practicing Rhode Island dentists accept Delta. Moreover, the government contends that the application of Delta's MFN clause has resulted in no discernable, monetary savings to Delta. *See supra* note 3. In contrast, the application and mere threat of application of Delta's MFN clause has sustained or increased consumer prices for dental services by preventing participating Delta dentists from discounting fees. More concretely, because most participating dentists are unwilling to contract with other plans at reduced fees due to the MFN clause, existing competing plans have not expanded into lower price options and new reduced-fee plans have been precluded from entering the market, thereby adversely impacting the consumer. The net effect is an alleged detrimental impact on the dental market without any *discernible* competitive benefits.

Consequently, viewing the government's allegations in the light most favorable to the government and acknowledging the fact intensive nature of the rule of reason inquiry, the government's Complaint has sufficiently navigated the constraints of Fed.R.Civ.P. 12(b)(6), albeit precariously, to state a claim under § 1.

### Conclusion

For the reasons stated, I recommend that defendant's motion to dismiss be denied.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of Court within ten (10) days of its receipt. Local Rule of Court 32; Fed. R.Civ.P. 72(b). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the district court. *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980).

July 12, 1996