Argued and submitted April 11, affirmed October 5, 1994, petition for review denied January 24, 1995 (320 Or 508)

# WILLAMETTE DENTAL GROUP, P.C., Oregon Dental Specialists, P.C., and Dental Registry, Inc., *Appellants,*

*v.*

# OREGON DENTAL SERVICE CORPORATION, *Respondent,*

*and*

# OREGON DENTAL ASSOCIATION, *Defendant.*

(9202-01032; CA A78616)

882 P2d 637

Jeffrey M. Batchelor argued the cause for appellant. With him on the briefs were Milo Petranovich, Darsee R. Staley and Lane Powell Spears Lubersky.

Thomas M. Triplett argued the cause for respondent. With him on the brief were Regina Hauser, Patricia A. Haim and Schwabe Williamson & Wyatt.

Before Deits, Presiding Judge, and Riggs and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiffs appeal from a summary judgment for defendant Oregon Dental Service on their antitrust and tort claims against ODS. Plaintiffs' claims arose from ODS's allegedly anticompetitive invocation of a "most favored nations" clause pertaining to payment for dental services. We affirm.

In 1955, defendant Oregon Dental Association, an affiliate of the American Dental Association, established ODS as a wholly owned subsidiary.[1] ODS contracts with employers and other groups to provide prepaid dental benefits to employees and other covered individuals. In providing those benefits, ODS, in turn, purchases dental services from dentists in the state.

The amount ODS compensates dentists for services rendered to patients covered by ODS plans depends on whether dentists are ODS "participating dentists." ODS pays participating dentists 100 percent of their fees so long as those fees do not exceed the 90th percentile of fees charged by all dentists. However, ODS reimburses nonparticipating dentists only to the extent their fees do not exceed the 51st percentile of fees charged by all dentists.

Dentists become ODS participating dentists by entering Participating Dentist Agreements with ODS.[2] Under those agreements, participating dentists agree to abide by all ODS rules and regulations. Among those rules is the provision that is the object of plaintiffs' claims: the so-called "most favored nations" clause[3] of ODS Rule 3. That clause read:

"The lowest fee accepted by the Dentist for services to be rendered to any group shall constitute the Dentist's filed fee schedule for payment of ODS claims."

---

[1] The facts are presented in the light most favorable to plaintiffs, as the non-moving party. *Seeborg v. General Motors Corporation*, 284 Or 695, 699, 588 P2d 1100 (1978).

[2] Over 95 percent of Oregon dentists are ODS participating dentists.

[3] Such clauses are alternatively denominated "most favored customer," "most favored buyer," "price protection," and "nondiscrimination" clauses. The substance is the same. Celnicker, "A Competitive Analysis of Most Favored Nations Clauses in Contracts Between Health Care Providers and Insurers," 69 NC L Rev 863 (1991).

Thus, under ODS's most favored nations clause, participating dentists cannot charge ODS rates higher than those charged to other dental benefits providers. For example, if a hypothetical dentist who performed root canal procedures for ODS-insured patients and received an average of $150 an hour for those services agreed to perform the same services for patients insured by some other benefits provider for $100 an hour, ODS, by invoking Rule 3, could reduce its reimbursement to $100 an hour. Obviously, the greater a dentist's percentage of ODS patients, the greater the disincentive to perform services for some other insurer at a lower rate.

In 1990, plaintiff Dental Registry, Inc. (DRI) began efforts to compete with ODS in the prepaid dental services market by developing a preferred provider organization (PPO) comprised, in part, of dentists from plaintiffs Willamette Dental Group, P.C. and Oregon Dental Specialists, P.C.[4] PPOs, like other prepaid dental benefits providers, market dental services to employers and other groups. PPOs first assemble groups of "preferred providers" — *i.e.*, dentists who agree to treat patients at reduced rates under the terms imposed by PPOs. After forming preferred provider panels, PPOs then sell access to the panels to employers and insurers through dental service agreements. One attraction of PPOs is that patients receiving dental benefits through PPOs remain free to go to dentists not included on the preferred provider panel.[5]

In 1990, DRI assembled a preferred provider panel consisting of "roughly 60" dentists. In October of that year, DRI entered into a dental service agreement with Western Employee Benefit Trust. Under that agreement, 3,500 to 4,500 employees became subscribers to the DRI PPO. In

---

[4] Plaintiffs are related corporations controlled by a single shareholder. Willamette Dental Group and Oregon Dental Specialists are both group dental practices. Willamette Dental Group provides general dentistry services, while Oregon Dental Specialists provides specialized dental services such as orthodontics and oral surgery. Both groups provide dental services to patients covered by ODS dental plans and plans supplied by other prepaid dental benefits providers. Dental Registry, Inc. (DRI) was organized for the purpose of developing alternative dental care delivery products.

[5] However, those patients, themselves, must then pay a larger percentage of the dentists' bills.

1991, PACC Health Plans, a major insurer, became interested in entering a dental service agreement with DRI, and the parties entered negotiations.

In late 1991, ODS learned of DRI's initial success. ODS discovered that DRI had entered into dental service agreements with the Western Employee Benefit Trust. It also learned that DRI planned to enter an agreement with PACC.

Immediately thereafter, on January 13, 1992, ODS invoked its most favored nations clause for the first time in its history.[6] ODS wrote to ODS participating dentists who joined the DRI PPO, informing those dentists that ODS was enforcing Rule 3. ODS's letters stated, specifically, that "effective immediately, [the dentists] must bill the same fees for ODS patients as those which [the dentists] have agreed to accept from Dental Registry, Inc." Subsequently, the vast majority[7] of dentists not employed by Willamette Dental Group resigned from DRI's preferred provider panel. Consequently, DRI terminated its dental service agreement with Western Employee Benefit Trust and aborted its negotiations with PACC.

Plaintiffs then sued ODA and ODS, asserting that the allegedly anticompetitive invocation of the most favored nations clause rendered ODA and ODS liable for monopolization and attempted monopolization, ORS 646.730, ORS 646.780, tortious interference with contractual and prospective business relations, and restraint of trade, ORS 646.725,

---

[6] Before January 13, 1992, ODS had not strictly enforced Rule 3. In February 1984, ODS threatened to enforce Rule 3 against a dentist who contracted to treat patients covered by American Family Health Services. However, two days later, ODS informed other participating dentists that ODS would not enforce Rule 3 unless reduced fees to American Family constituted a significant part of the dentists' practice. In November 1990, ODS determined that some participating dentists were charging lower fees to Vantage PPO. However, ODS did not take action against those dentists until November 1991. At that time, ODS informed those dentists servicing Vantage patients that ODS would not enforce Rule 3 according to its terms, but would simply not allow those dentists to increase their fees with ODS on any procedure where the corresponding ODS fee exceeded the Vantage fee. In December 1991, after meeting with Vantage representatives, ODS reversed its position and decided to take no action whatsoever with respect to the Vantage dentists. Not until March 1992, after DRI's lawyer complained of discriminatory enforcement of Rule 3, did ODS strictly enforce the rule against Vantage dentists.

[7] The exact number of dentists who resigned from the panel is not specified in the record.

ORS 646.780.[8] On defendants' motions for summary judgment the trial court concluded that plaintiffs' monopolization and attempted monopolization claims failed as a matter of law because

> "the consistent holdings of Federal courts are that 'most favored nation' clauses are not anti-competitive and are not in violation of antitrust laws."

The trial court also concluded that plaintiffs' tortious interference claims failed as a matter of law because

> "it cannot be an 'improper purpose' for the purchaser to insist that it be treated the same as his competitor."

Plaintiffs first assign error to the trial court's entry of summary judgment against their antitrust claims. The pertinent statute, ORS 646.730, section 2 of Oregon's "little Sherman Act,"[9] provides:

> "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce, shall be in violation of ORS 136.617, 646.705 to 646.805 and 646.990."

■ There are no reported decisions construing ORS 646.730. Accordingly, we look to federal decisions interpreting section 2 of the Sherman Act for persuasive, albeit not binding, guidance. ORS 646.715(2).

■■ The United States Supreme Court has established elements for the offenses of monopolization and attempted monopolization. Monopolization under Sherman Act, section 2, consists of:

> "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or

---

[8] After defendants moved for summary judgment, and before the trial court ruled on that motion, plaintiffs withdrew their restraint of trade claim. After filing this appeal, plaintiffs dismissed all claims against ODA.

[9] The analogous federal statute, Sherman Act, section 2, provides:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony * * *." 15 USC § 2 (1988 & Supp V 1993).

historic accident." *United States v. Grinnell Corporation*, 384 US 563, 570-71, 86 S Ct 1698, 16 L Ed 2d 778 (1966).

To prove attempted monopolization, plaintiffs must show:

"(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* ____ US ____ , 113 S Ct 884, 890-91, 122 L Ed 2d 247, 257 (1993).

■ Because willful acquisition or maintenance of monopoly power for purposes of monopolization requires proof that the defendant engaged in predatory conduct, proof of such conduct is an element common to both monopolization and attempted monopolization. *See Transamerica Computer Co., Inc. v. IBM Corp.*, 698 F2d 1377, 1382 (9th Cir 1983), *cert den* 464 US 955 (1983). For the reasons discussed below, we conclude that ODS's conduct was not predatory for purposes of ORS 646.730. Accordingly, even without reference to the other elements of monopolization and attempted monopolization, summary judgment against plaintiffs' antitrust claims was proper.

■ Predatory conduct is "behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 US 585, 605 n 32, 105 S Ct 2847, 86 L Ed 2d 467 (1985). To determine whether a defendant's conduct meets this definition, courts assess the impact of that conduct on (1) the defendant, (2) the defendant's competitors, and (3) consumers. 472 US at 605.

■ With respect to impact on the defendant, courts examine the alleged predatory conduct in terms of economic efficiency. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., supra*, 472 US at 605. If a defendant " 'attempt[s] to exclude rivals on some basis other than efficiency,' then it is fair to characterize its behavior as predatory." 472 US at 605 (citations omitted); *Pacific Exp., Inc. v. United Airlines, Inc.*, 959 F2d 814, 818 (9th Cir), *cert den* ____ US ____ , 113 S Ct 814, 121 L Ed 2d 686 (1992).

Here, plaintiffs assert that ODS cannot justify its conduct in terms of efficiency. In particular, they contend

that ODS did not invoke the most favored nations clause vis-a-vis DRI so that it could pay dentists less. Instead, plaintiffs assert that ODS invoked that clause to force DRI out of the market. Plaintiffs point to ODS's historically inconsistent application of Rule 3 as evidence of ODS's intent to destroy DRI.[10] Conversely, ODS argues that, *as a matter of law*, its enforcement of Rule 3 cannot, and does not, constitute predatory conduct. As support for that "bright line" proposition, ODS invokes two federal decisions holding that the use of most favored nations clauses does not, as a matter of law, constitute predatory conduct. *See Ocean State Physicians Health Plan v. Blue Cross*, 883 F2d 1101 (1st Cir 1989), *cert den* 494 US 1027 (1990); *Kitsap Physicians Serv. v. Washington Dental Serv.*, 671 F Supp 1267 (WD Wash 1987).[11]

We find neither position ultimately persuasive.

■ Plaintiffs' argument fails because it would require us to impute antitrust liability on the basis of ODS's intent. "Bad" anticompetitive intent, without more, does not render an actor's conduct predatory. *See Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F2d 227, 232 (1st Cir 1983). One leading commentator has expressed this principle as follows:

> "[T]he critical point is that the nature and consequences of a particular practice are the vital consideration, not the purpose or intent. It is the purpose or intent of any competitively energetic firm to prevail over its actual or potential rivals. The firm which drives out or excludes rivals by selling a superior product or producing at substantially lower costs 'intends' to do so. But so to read 'purpose or intent' would be to read the behavior requirement out of the monopolization offense altogether and make monopoly unlawful per se, which the courts clearly have not 'intended' to do." 3 Areeda & Turner, *Antitrust Law* 76 (1978).

Nor do we accept ODS's assertion, buttressed by federal decisions, that, as a matter of law, enforcement of a most favored nations clause can *never* constitute predatory conduct. As noted, ODS relies heavily on the reasoning of *Ocean State Physicians Health Plan v. Blue Cross, supra,* and

---

[10] *See* n 6, *supra*.

[11] Our research suggests that *Ocean State* and *Kitsap* are the only two reported cases addressing whether the use of a most favored nations clause may constitute predatory conduct for the purposes of monopolization or attempted monopolization.

*Kitsap Physicians Serv. v. Washington Dental Serv., supra.* We perceive no meaningful distinction between the facts of those cases and this case.[12] However, we believe their reasoning, although correct in part, is incomplete.

In *Ocean State*, the court concluded that the use of most favored nations clauses furthers competition on the merits. 883 F2d at 1110. The court stated:

> "[A] policy of insisting on a supplier's lowest price — assuming that the price is not 'predatory' or below the supplier's incremental cost — tends to further competition on the merits and, as a matter of law, is not exclusionary." 883 F2d at 1110.

The *Ocean State* court supported this conclusion by comparing the facts before it where "the efficiency justification — lower costs — is evident," to the facts of *Aspen Skiing*, where the defendant failed to offer any efficiency justification for its conduct. 883 F2d at 1112.

*Kitsap*, like *Ocean State*, invoked an efficiency rationale. There, the court observed that the use of most favored nations clauses "makes good business sense" because such clauses

> "[provide] insurance companies with protection from (1) being overcharged by dentists, and (2) in the long term, being priced out of the highly competitive dental insurance market." 671 F Supp at 1269.

*Kitsap's* and *Oceans State's* consideration of economic efficiency, although accurate in many respects, is hardly conclusive. In this context,[13] a preoccupation with

---

[12] In *Ocean State*, an HMO and a class of its physicians sued Blue Cross alleging monopolization under section 2 of the Sherman Act. 883 F2d at 1104. Because Blue Cross admitted possessing monopoly power, the only issue was whether Blue Cross willfully maintained monopoly power through its use of a most favored nations clause. 883 F2d at 1110. In *Kitsap*, a dental care service provider sued Washington Dental Service (WDS) alleging monopolization of the prepaid dental market under section 2 of the Sherman Act after WDS invoked a most favored nations clause against participating dentists. 671 F Supp at 1268.

[13] An efficiency analysis is obviously sensible in other contexts, particularly when a defendant commits alleged predatory conduct in its capacity as a seller. For example, selling below one's incremental cost or forgoing increased sales while refusing to cooperate with a competitor may indicate predatory conduct because such conduct does not make economic sense. *See Aspen Skiing Co. v. Aspen Highlands Skiing Co., supra,* 472 US at 607-11 (defendant's refusal to cooperate with competitor in offering multiple ski area lift tickets caused it to pass up

economic efficiency is almost tautological. A purchaser's enforcement of a most favored nations clause will always be "efficient" in the sense that the purchaser will pay less for goods or services than it would have otherwise.

We note, moreover, the possibility that, in some circumstances, the enforcement of most favored nations clauses can have severe anticompetitive effects. Such clauses may

> "(1) eliminate a dynamic mechanism by which prices are racheted down to the competitive level; (2) reduce output [of medical services]; and (3) prevent the market from rewarding more efficient distribution systems." Celnicker, "A Competitive Analysis of Most Favored Nations Clauses in Contracts Between Health Care Providers and Insurers," 69 NC L Rev 863, 884 (1991).

*Accord Spectrum Sports, Inc. v. McQuillan, supra,* ___ US at ___, 113 S Ct at 892 ("It is sometimes difficult to distinguish robust competition from conduct with long term anticompetitive effects.").

■ Given those considerations, we decline to hold that the enforcement of most favored nations clauses can never constitute predatory conduct. Consequently, we proceed, consistent with *Aspen Skiing, supra,* to consider whether the proof in this record pertaining to impact on competitors and consumers presents a triable issue with respect to predatory conduct.

There is no evidence in the record that ODS's enforcement of Rule 3 has unreasonably excluded competition. Indeed, the evidence is to the contrary. ODS, in moving for summary judgment, presented evidence that the prepaid dental benefits market is highly competitive, with ODS competing with Blue Cross Blue Shield, Standard Insurance, Kaiser, Aetna, Travelers, Prudential, and Great Western. ODS also argued, reasonably, that it should not be obliged to subsidize a competitors efforts by paying higher fees for the same services.

---

"immediate benefits" and supported an inference that defendant was not motivated by efficiency concerns).

Conversely, although plaintiffs argue that ODS's invocation of Rule 3 has excluded PPO competitors from the prepaid dental benefits market,[14] they have adduced no evidence that ODS's conduct *unfairly* restricted competition. *See Spectrum Sports, Inc. v. McQuillan, supra*, ___ US at ___, 113 S Ct at 892 ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.") In particular, although plaintiffs contend that ODS's enforcement of Rule 3 excluded them from the prepaid dental benefits market by preventing them from securing the dental services necessary to compete in that market, plaintiffs neither proffered any evidence that they undertook reasonable efforts in response to ODS's conduct nor offered any credible explanation of why such efforts would have proved futile. *Accord Aspen Skiing, supra*, 472 US at 607-08 (evidence that failed competitors unsuccessfully tried other means to compete may indicate that a defendant has unnecessarily restricted competition).

Reduced to its essentials, plaintiffs' argument is that ODS's invocation of the most favored nations clause was unfair because it forced dentists, as suppliers of dental services, to choose between (1) refusing to deal with plaintiffs and continuing to receive ODS's higher rates; or (2) continuing to deal with plaintiffs and being paid for their ODS work at the lower "most favored nations" rates — and that was no choice at all. However, plaintiffs offered no evidence explaining why they could not have countered the allegedly exclusionary effect of Rule 3 by *raising* their reimbursement rates. Economic common sense dictates that the higher the plaintiff's rates, and the smaller the resultant difference between those rates and ODS's rates, the less likely it would be that dentists would choose not to deal with plaintiffs.[15] However, plaintiffs neither presented evidence that they unsuccessfully attempted such measures nor explained why such attempts would have proved futile.

---

[14] Plaintiffs point particularly to ODS's alleged exclusion of the DRI and Vantage PPOs and assert that the threatened enforcement of Rule 3 prevented Blue Cross Blue Shield from forming a PPO. *See* n 6, *supra*.

[15] This would seem especially so for those dentists with a relatively smaller ODS patient mix in their practices.

Given ODS's proof of a highly competitive market and plaintiffs' failure to contradict that proof, there is no triable issue concerning a predatory impact on competition.

Finally, nothing in this record suggests an impact on consumers sufficient to characterize ODS's conduct as predatory. ODS presented evidence that the competitive nature of the prepaid dental benefits market provides strong incentives to charge consumers competitive prices. Conversely, although plaintiffs assert that the use of Rule 3 allows ODS to "maintain the price of dental services at a high, anticompetitive, level," they proffered no evidence from which a trier of fact could reasonably make that conclusion.

The summary judgment record permits only one conclusion: ODS's enforcement of Rule 3, whatever its intent, was not predatory. Accordingly, we affirm the trial court's summary judgment on the antitrust claims.

 Plaintiffs next assign error to the trial court's allowance of summary judgment against plaintiffs' claims for intentional interference with contract and interference with prospective business advantage. To succeed on those claims, plaintiffs must prove that: (1) ODS intentionally interfered with a proposed or existing relationship; (2) ODS interfered with an improper motive or by using improper means; and (3) as a result plaintiffs were damaged beyond the fact of interference itself. *Ron Tonkin Gran Tourismo v. Wakehouse Motors*, 46 Or App 199, 208, 611 P2d 658, *rev den* 289 Or 373 (1980). Motives or means may be wrongful by reason of a statute, regulation, recognized rule of common law, or established standard of a trade or profession. *Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1978).

 In this case, the propriety of summary judgment turns on the second, "improper means/improper motive" element. Plaintiffs argue that ODS's motives or means were improper because ODS's conduct violated Oregon antitrust law; that argument fails for the reasons discussed above. In the alternative, plaintiffs argue that, even if ODS is not liable under the antitrust laws, those laws "condemn ODS's motives and means as wrong." As support for that proposition, plaintiffs invoke *Top Service Body Shop v. Allstate Ins. Co., supra*:

"[I]t is not necessary to prove all the elements of liability for another tort if those elements that pertain to the defendant's conduct are present. For instance, fraudulent misrepresentations made to a third party are improper means of interference with plaintiff's contractual relations whether or not the third party can show reliance injurious to himself." 283 Or at 210 n 11. (Citations omitted.)

*Top Service Body Shop* is not so elastic. It is one thing to suggest that lying is "wrongful" even if it does not rise to the level of actionable fraud. It is quite another to hold that competitive conduct permitted under the antitrust laws may be punished as tortious interference. Indeed, such common law "back dooring" would subvert the function of antitrust law in defining, and regulating, the boundary between permissible and impermissible competitive conduct. Summary judgment against plaintiffs' tort claims was proper.[16]

Affirmed.

---

[16] Plaintiffs also argue that ODS's conduct was "improper" for purposes of the tortious interference claims because ODS breached an implied covenant of good faith in the participation agreements between ODS and the dentists who resigned from the DRI PPO as a result of ODS's enforcement of Rule 3. Because plaintiffs failed to raise that argument in contesting summary judgment before the circuit court, we decline to address it.