Argued and submitted June 18, reversed in part; otherwise affirmed
November 14, 2001, petition for review denied March 5, 2002 (333 Or 567)

**VOLT SERVICES GROUP,**
a division of Volt Management Corporation,
a Delaware corporation,
*Appellant,*

*v.*

**ADECCO EMPLOYMENT SERVICES, INC.,**
a Delaware corporation,
and Adecco Field Management, Inc.,
a Delaware corporation,
*Respondents.*

9901-00240; A109509

35 P3d 329

Timothy R. Volpert argued the cause for appellant. With him on the briefs were Richard N. Van Cleave, Mark J. Hackett, and Davis Wright Tremaine LLP.

Richard C. Hunt argued the cause for respondents. With him on the brief were Allyson S. Krueger and Barran Liebman LLP.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

**BREWER, J.**

Plaintiff appeals from a summary judgment for defendant on plaintiff's claims for intentional interference with economic relations, unfair competition, and unjust enrichment.[1] Plaintiff assigns error to the trial court's conclusions that there was no genuine issue of material fact with respect to any of its claims and that defendant was entitled to judgment as a matter of law. Plaintiff also assigns error to the trial court's denial of a portion of its motion to compel production of documents and its motion to file an amended complaint. We reverse the summary judgment on plaintiff's claims for intentional interference with economic relations and unjust enrichment, and we reverse the order denying plaintiff's motion to amend the complaint; otherwise, we affirm.

■    We state the facts in the light most favorable to plaintiff, the nonmoving party on summary judgment. *Olson v. F & D Publishing Co., Inc.*, 160 Or App 582, 584, 982 P2d 556 (1999). Plaintiff and defendant are businesses that provide temporary employees to perform services for business customers. Large customers typically select one temporary service provider as the vendor responsible for coordinating all temporary employee staffing needs at one location or throughout the customer's facilities nationwide. That provider is known as the "master vendor." The master vendor generally is responsible for recruiting, training, and placing temporary employees within the customer's facilities; for maintaining relationships with the customer's managers; and for handling all personnel matters relating to temporary employees.

In May 1997, Nike, Inc. (Nike) contracted with plaintiff to serve as master vendor for its Beaverton facilities. The contract obligated plaintiff to provide temporary employees to Nike until the date the contract was terminated by either party. At the Nike site, plaintiff employed both administrative employees, whose contracts are at issue in this case,

---

[1] Defendants Adecco Employment Services, Inc., and Adecco Field Management, Inc., filed a single brief in this appeal. For ease of reference, we use the singular "defendant" to refer to both.

and technical employees. The written contracts between plaintiff and each employee assigned to Nike provided that the employee "will not accept employment directly or indirectly from any customer for a period of ninety (90) days following completion of your assignment with that customer."

On October 14, 1998, Nike notified plaintiff that its contract would be terminated in the near future and that defendant would become Nike's master vendor. On December 4, Nike notified plaintiff that defendant would become Nike's master vendor on January 11, 1999. Between December 4 and January 11, defendant contacted plaintiff's temporary employees who were working at Nike and encouraged them to apply to defendant, as the new master vendor, for the same positions they occupied while employed by plaintiff. In this manner, approximately 150 of plaintiff's temporary employees retained their positions at Nike by entering defendant's employ effective January 11, 1999.

Plaintiff then brought this action against defendant alleging claims for intentional interference with economic relations based on its contracts with its employees, unfair competition, and unjust enrichment.[2] In response to a request for production made by plaintiff, defendant produced some documents but declined to produce others. Plaintiff filed a motion to compel production of the documents defendant had refused to produce. The court ordered defendant to submit the disputed documents for *in camera* inspection. After reviewing the documents, the court ordered defendant to produce some of the submitted documents, but it denied the remainder of plaintiff's motion.

Defendant moved for summary judgment on all claims. In response, plaintiff submitted, among other evidence, the deposition testimony of Catherine King, defendant's Northwest regional manager, that the temporary service industry typically allowed for a transition period between master vendors because "there are economics involved, and that's clearly understood."

---

[2] Plaintiff also alleged a claim for intentional interference with prospective economic relations based on its relationship with Nike, but it voluntarily dismissed that claim before the trial court entered summary judgment for defendant.

On January 7, 2000, plaintiff moved, pursuant to ORCP 23 A,[3] to amend its complaint by adding an alternative claim for intentional interference with economic relations that was not based on an existing contract. Plaintiff argued that the amendment would not prejudice defendant, because "there is not a single fact in * * * [the] claim that would not also be a matter of proof in the [interference claim] already pled." Defendant responded that, if no new evidence was implicated by the alternate claim, that claim would be subsumed by defendant's pending motion for summary judgment. On February 4, the trial court entered an amended order granting summary judgment in favor of defendant on all claims; on February 8, the trial court denied plaintiff's motion to amend the complaint. This appeal followed.

■      Plaintiff assigns error first to the trial court's grant of summary judgment on each of its three claims. We review the summary judgment record to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We view the evidence and all reasonable inferences that may be drawn from the evidence in the light most favorable to the nonmoving party, in this instance plaintiff. *Id.* at 408. We will affirm only if no objectively reasonable factfinder could return a verdict for plaintiff. ORCP 47 C.

■      The elements of plaintiff's first claim, for intentional interference with economic relations, are: (1) intentional interference with a proposed or existing economic relationship; (2) with an improper motive or by use of improper means; and (3) damage beyond the fact of interference itself. *Willamette Dental Group v. Oregon Dental Service*, 130 Or App 487, 498, 882 P2d 637 (1994), *rev den* 320 Or 508 (1995). Plaintiff argues that defendant improperly interfered with the restrictive covenant in plaintiff's contracts with its employees by hiring those employees before their assignments ended at Nike. Defendant replies that, as a matter of law: (1) the restrictive covenant is unenforceable and that,

---

[3] ORCP 23 A provides that, after a responsive pleading is filed, "a party may amend the pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."

therefore, its actions did not interfere with plaintiff's contractual relationship with its employees; (2) it did not act with an improper motive or use improper means; and (3) its actions as a business competitor were privileged.

■■ We begin by considering whether the restrictive covenant in plaintiff's contracts with its employees is unenforceable as a matter of law. A noncompetition provision in an employment contract is a covenant in restraint of trade. *North Pacific Lbr. Co. v. Moore*, 275 Or 359, 364, 551 P2d 431 (1976).

> "Three things are essential to the validity of a contract in restraint of trade[:] (1) it must be partial or restricted in its operation in respect either to time or place; (2) it must come on good consideration; and (3) it must be reasonable, that is, it should afford only a fair protection to the interests of the party in whose favor it is made, and must not be so large in its operation as to interfere with the interests of the public." *Id.* (citing *Eldridge et al. v. Johnston*, 195 Or 379, 403, 245 P2d 239 (1952)).

Defendant contends that the covenant is unreasonable for three reasons, which we analyze in turn. First, relying on *Rem Metals Corp. v. Logan*, 278 Or 715, 565 P2d 1080 (1977), defendant argues that plaintiff has *no* legitimate interest in its relationship with its temporary employees that is entitled to *any* protection. *Rem Metals* holds that "[t]he fact that [an employee's knowledge, skill or facility] were acquired or developed during the employment does not, by itself, give the employer a sufficient interest to support a restraining covenant, even though the on-the-job training has been extensive and costly." *Id.* at 720-21 (quoting Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv L Rev 625, 652 (1960)). Plaintiff responds that the employer's interest "need not be in the form of a trade secret or a secret formula; it may consist of nothing more than valuable 'customer contacts.' " *North Pacific Lbr.*, 275 Or at 364 (citing Blake, 73 Harv L Rev at 657). Plaintiff contends that its customer contacts—including its relationship with Nike—constitute a protectible interest.

■■ Contacts between an employer's employees and its customers can create a protectible interest when the nature

of the contact is such that there is a substantial risk that the employee may be able to divert all or part of the customer's business. Blake, 73 Harv L Rev at 657. In turn, "[w]hether the risk will be sufficiently great to warrant a restriction, and how broad a restriction will be permitted, depends upon the extent to which the employee is likely to be identified in the customer's mind with the product or service being sold." *Id.* at 658-59. Several Oregon cases construing restrictive covenants have held that customer contacts created a protectible interest. *See Cascade Exchange v. Reed*, 278 Or 749, 565 P2d 1095 (1977) ("[E]mployees' work necessarily involved access to plaintiff's 'customer lists,' as well as some other 'specialized' information relating to customers, and employees also had frequent and close contacts with plaintiff's customers on a personal basis, as in [*North Pacific Lbr.* and] *Kelite Prod., Inc. v. Brandt et al*, 206 Or 636, 294 P2d 320 (1956).").
In the context of the temporary employment service industry, workers are *the very commodity* in which both plaintiff and defendant deal. Customers such as Nike pay an hourly rate to a vendor for filling a position; a portion of that revenue is passed to the worker who fills the position. In the absence of an enforceable restrictive covenant, plaintiff's employees simply could have agreed with Nike to eliminate the middleman, thereby diverting *all* of plaintiff's business—a process known as disintermediation. *See Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F2d 1553, 1558 (11th Cir 1983) (holding that the threat of disintermediation creates a protectible interest sufficient to justify a technical service firm's restrictive covenant with its employees).[4] Accordingly, plaintiff has advanced an interest that is sufficient as a matter of law to support a restrictive covenant.

---

[4] As the Eleventh Circuit Court of Appeals explained:

"Disintermediation is the actualization of the ever-present cry to eliminate the middleman, *i.e.*, direct solicitation, negotiation and contracting between the firm and the worker. Eliminating the middleman is at first blush a facile and attractive alternative. However, middlemen exist because they provide a useful and highly-valued service. If [the plaintiff's] covenant with its [temporary employees] is to have any justification, that justification must be to protect [the plaintiff's] role as a middleman in the market for information between [temporary employees] and client firms." *Consultants & Designers,* 720 F2d at 1558.

■ ■ Second, defendant argues that the noncompetition provision is unreasonable in duration. Defendant contends that, if it is applied to temporary employees who work for periods as brief as one day, the 90-day restriction can lead to harsh and unreasonable results. The reasonableness of a noncompetition covenant must be determined in view of what is reasonably necessary to safeguard the employer's protectible interest. *Mail-Well Envelope Co. v. Saley*, 262 Or 143, 155, 497 P2d 364 (1972); *see also Eldridge*, 195 Or at 408 (stating an analogous test for a noncompetition agreement in the sale of a business). Defendant cites no case in which *any* court has found a 90-day restrictive covenant to be unreasonable by reason of its duration. *Cf. Consultants & Designers*, 720 F2d at 1557 ("The covenant is limited to a period of [90] days and to the specific client worksite at which [the plaintiff temporary employer] placed the individual employee. *It would be difficult to conceive of a more limited post-employment covenant*." (Emphasis added.)). In light of plaintiff's evidence concerning the nature of the temporary employment industry and plaintiff's interest in maintaining its relationship with its customers, we conclude that defendant has not established that, as a matter of law, the 90-day restriction is unreasonable in duration.

■ ■ Finally, defendant argues that the restrictive covenant is unenforceable because it offends public policy. Defendant reasons:

"First, if each time a new vendor is chosen, temporary employees are restrained from working for the new vendor at the same client's location, a significant number of individuals would be removed from the pool of persons available to fill the client's needs. Second, it would negatively impact the continuity of the client company's workforce * * *. Finally, enforcement of restrictive covenants, such as plaintiff's, would mean that each time a company contracts with a new vendor[,] a large number of individuals would lose their jobs with that client. *Eldridge*[ ], 195 Or [at] 403 (restrictive covenants that interfere with the interests of the public are invalid restraints on trade); *National Employment Service Corp. v. Olsten Staffing Service, Inc.*, 761 A2d [401, 404 (NH 2000)] (90-day restriction on temporary employees post-employment would be contrary to

public policy and would impose undue hardship on the temporary at-will employees).""

Defendant's focus on inconvenience to *a client company* misses the mark: The well-being of a single business does not necessarily coincide with the best interest of the public as a whole. Substantively, however, we disagree with the view expressed by the New Hampshire Supreme Court in *National Employment.* In explaining its conclusion, the court said only that "[p]ost-employment restrictions on [light-industrial employees without access to proprietary information] would be contrary to public policy and impose an undue hardship, particularly for at-will employees who could be discharged at any time." 761 A2d at 405. The court did not explain its reasoning, nor do we perceive it. Without elaboration, the same assertion could be made for noncompetition covenants as applied to *all* at-will employees. That is not the law in Oregon. *See Lewis v. Oregon Beauty Supply Co.*, 302 Or 616, 620-21, 733 P2d 430 (1987) (holding that an at-will employment contract can form the basis of an intentional-interference claim). Because defendant has not established that plaintiff's restrictive covenant is unreasonable as a matter of law, and because defendant has advanced no public policy arguments sufficient to invalidate the covenant, the trial court erred in concluding that the covenant was unenforceable as a matter of law. Accordingly, plaintiff provided evidence of a contract satisfying the first element of the tort.

██ ██ Turning to the second element of interference with contractual relations, plaintiff argues that defendant used improper means in obtaining the services of plaintiff's temporary employees. Improper means can be established by showing a violation "of a statute or other regulation, or a recognized rule of common law, or perhaps *an established standard of a trade or profession." Top Service Body Shop v. Allstate Ins. Co.*, 283 Or 201, 209-10, 582 P2d 1365 (1978) (emphasis added). Plaintiff contends that defendant breached an industry standard by hiring plaintiff's employees without first providing a reasonable transition period after taking over as master vendor. As evidence, plaintiff argues that guidelines of the National Association of Temporary Staff and Services (NATSS), of which both plaintiff and

defendant are members, embody relevant industry standards, and it also relies on its counsel's affidavit stating that an expert witness would elaborate on those standards.

NATSS publishes a Code of Ethics that includes guidelines pertaining to the transition from one master vendor to another. That code provides:

> "As a condition of membership in [NATSS], each member pledges its support of, and adherence to, the principles set forth below. Through their voluntary compliance with these principles, NATSS members acknowledge that such compliance is in the best interests of the staffing services industry, its customers, and its employees. NATSS members agree always to strive:
>
> "\* \* \* \* \*
>
> "To observe the following guidelines to ensure an orderly transition when taking over an account being serviced by another staffing firm:
>
> "—the outgoing firm and its employees should, whenever feasible, be given reasonable prior notice that the account is being transferred;
>
> "—*assigned employees of the outgoing firm should, whenever feasible, be allowed to continue working on the payroll of the outgoing firm for some reasonable transition period; thereafter, they should be given the choice of accepting an assignment with another customer of the outgoing firm if one is available, or applying to stay on their current assignment with the new staffing firm.*
>
> "These guidelines are not intended to prohibit or discourage any other provisions or arrangements, agreeable to the parties, that achieve an orderly transfer of accounts. NATSS members are encouraged, whenever feasible, to specifically address the terms and conditions relating to the transfer of accounts in written agreements with their customers." (Emphasis added.)

Plaintiff contends that the "reasonable transition period" to which the guidelines refer should have commenced after January 11, 1999, and that defendant improperly hired plaintiff's employees before that reasonable transition period even began. Defendant argues, and the trial court agreed, that the

guidelines are voluntary, and therefore do not constitute an industry standard.[5]

Defendant has cited no authority for the proposition that an industry may not establish *voluntary standards* of conduct for its members that are relevant in deciding whether improper means of interference have been used. That omission is understandable, in view of the fact that private industry standards lack the force of law and, thus, typically are advisory. *See* Daniel E. Feld, Annotation, *Admissibility in Evidence, on Issue of Negligence, of Codes or Standards of Safety Issued or Sponsored by Governmental Body or by Voluntary Association*, 58 ALR3d 148 (1974). Thus, when the courts refer to an "established" industry standard, the focus is not on whether a standard is legally enforceable but, instead, relates to its recognition within the industry. The commentary to the *Restatement (Second) of Torts*[6] explains the role of industry standards in determining whether a defendant has used improper means of interference:

"[In determining whether the actor's conduct is improper, i]t has been suggested that the real question is whether the actor's conduct was fair and reasonable under the circumstances. *Recognized* standards of business ethics and business customs and practices are pertinent, and consideration is given to concepts of fair play and whether the defendant's interference is not 'sanctioned by the rules of the game.'" *Restatement (Second) of Torts* § 767, cmt j (1979) (emphasis added).

We find the foregoing reasoning persuasive. Although the NATSS Code is advisory, evidence that members *recognize* it as a standard of ethics may assist the trier of fact in deciding whether defendant's conduct was improper

---

[5] Each party contends that the other has contradicted itself in this action by asserting at various times that the NATSS guidelines embody an industry standard and at others times that the guidelines do not. We reject those arguments without discussion.

[6] In other cases discussing the element of improper means, the Supreme Court has relied on the *Restatement. See, e.g., Allen v. Hall*, 328 Or 276, 285-86, 974 P2d 199 (1999); *Top Service Body Shop*, 283 Or at 209-10; *North Pacific Lbr.*, 275 Or at 369-70.

under the circumstances. *See Hansen v. Abrasive Engineering and Manufacturing*, 317 Or 378, 384, 856 P2d 625 (1993) (holding in a negligence action that *advisory* industry safety standards may represent a consensus regarding what a reasonable person in a particular industry would do and, thus, may assist the trier of fact in deciding whether the defendant has met the standard of due care). Likewise, plaintiff's expert could assist the jury in determining whether defendant employed improper means according to recognized industry standards. *See Hoke v. The May Department Stores Co.*, 133 Or App 410, 418, 891 P2d 686 (1995) (holding that an affidavit stating that an expert would testify to the reasonableness of the defendant's conduct was adequate evidence to preclude summary judgment on a negligence claim). Accordingly, the trial court was mistaken in concluding that plaintiff offered no evidence that defendant used improper means in interfering with plaintiff's contracts with its temporary employees.[7]

As to the final element of its interference claim, plaintiff contends that it produced evidence of damages in two ways:

"First, because [defendant] failed to follow industry standards, plaintiff lost the continuing stream of income that it should have received * * *. Whether that is true can only be determined by the separate factual determination as to whether a standard in this industry required [defendant] to subcontract with plaintiff during a 'reasonable transition period.' * * *

"Second, * * * because [defendant] hired away plaintiff's employees, plaintiff lost the income that it could have earned if it had been given an opportunity to place its employees with other clients * * *. Whether that is true likewise depends on the separate factual determination as to whether a standard in this industry required that there be a transition period * * *."

---

[7] We reject without extended discussion defendant's argument that the NATSS Code is not relevant to the issue of improper means because it provides that it is "not intended to discourage any other provisions or arrangements, agreeable to the parties, that achieve an orderly transfer of accounts." Defendant asserts that Nike and plaintiff made such arrangements. Plaintiff disputes that assertion. The parties are free to urge their respective points of view to the trier of fact.

Plaintiff is correct. Because it was entitled to the claimed lost income only if defendant's actions were wrongful, plaintiff's entitlement to damages depends on whether defendant's conduct violated industry standards. Thus, defendant's conduct relative to industry standards is a material issue of fact on both the improper means element and the damages element of plaintiff's interference claim.

■ Defendant argues that, as a matter of law, any interference falls squarely within the business competitor's privilege recognized in *North Pacific Lbr.*:

"One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if

"(a) the relation concerns a matter involved in the competition between the actor and the competitor, and

"(b) *the actor does not employ improper means*, and

"(c) the actor does not intend thereby to create or continue an illegal restraint of competition, and

"(d) the actor's purpose is at least in part to advance his interest in his competition with the other." 275 Or at 369 (emphasis added) (citing *Restatement of Torts* § 768).

Because we have determined that plaintiff has established the existence of a genuine issue of material fact as to whether defendant used improper means, we conclude that the trial court erred in concluding as a matter of law that defendant's conduct was privileged. Because genuine issues of material fact remain as to the claim itself and a possible defense, the trial court erred in entering summary judgment on plaintiff's claim for interference with economic relations.

■ We turn to plaintiff's claim for unjust enrichment. To establish unjust enrichment, plaintiff must offer evidence that (1) plaintiff conferred a benefit on defendant; (2) defendant was aware that it had received a benefit; and (3) under the circumstances it would be unjust for defendant to retain the benefit without paying for it. *Jaqua v. Nike, Inc.*, 125 Or App 294, 298, 865 P2d 442 (1993). Plaintiff contends that defendant received a benefit consisting of the time and money plaintiff spent "recruiting, interviewing, testing and

screening applicants so it [could] hire the best employees and match them to the right temporary assignments." Defendant argues that

> "[t]here is no evidence to support an argument that [defendant] did not have to incur similar expenses when [it] recruited job seekers and put those individuals through [defendant's] application process, interviewed the individuals, had them complete paperwork, checked references, and ultimately made a hiring decision.
>
> "* * * All job seekers with [defendant] were required to follow the same application and interview process [regardless of their status as plaintiff's temporary employees at Nike]."

Notably, defendant does not argue that plaintiff's prior placement of employees with Nike did not assist defendant in matching the right person with the right job. Moreover, whether plaintiff's placement allowed defendant to take cost-saving steps in its similar application and interview process presents an issue of material fact.

As to the second element of unjust enrichment, plaintiff contends that King's deposition testimony provides evidence that defendant knew that it received a benefit by hiring plaintiff's Nike-placed employees. King testified that the reason for the "reasonable transition period" described in the NATSS guidelines when a client company changes master vendors is that "there are economics involved, and *that's clearly understood.*" (Emphasis added.) Again, viewed in the light most favorable to plaintiff, King's testimony provides evidence of defendant's awareness of an economic benefit received.

The last element of unjust enrichment is that "under the circumstances it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *Jaqua,* 125 Or App at 298. In this case, the inquiry turns on the issue that also will be dispositive on plaintiff's interference claim: whether defendant used improper means. The circumstances will include defendant's actions and the industry standard; whether the defendant retained a benefit unjustly will be resolved by comparison of the two. Accordingly, the trial

court erred in entering summary judgment on plaintiff's claim for unjust enrichment.

■     Next, we turn to plaintiff's unfair competition claim. Plaintiff relies solely on a federal district court decision, *Bunch v. Artec International Corp.*, 559 F Supp 961 (SDNY 1983), for the proposition that competitive conduct violating an industry standard may constitute unfair competition in Oregon. However, the Oregon Supreme Court held in *Wedgwood Homes v. Lund*, 294 Or 493, 659 P2d 377 (1983), that unfair competition is limited to misappropriation of a competitor's intellectual property, such as trade name or trade dress, and it requires a showing of a likelihood of consumer confusion. *Id.* at 495. Plaintiff did not allege a likelihood of consumer confusion, nor did it offer such evidence. The trial court did not err in granting summary judgment to defendant on plaintiff's unfair competition claim.

■■ Plaintiff next assigns error to the trial court's denial of plaintiff's motion to amend the complaint to plead a claim for interference with business relations not involving an existing contract. The court's refusal to allow the amendment apparently was premised on its conclusion that, on the basis of the record then before it, the additional claim could not withstand summary judgment. "Although we generally review a court's denial of a motion to amend only for abuse of discretion, when the denial results from a substantive legal conclusion, we review the correctness of that conclusion" for errors of law. *Wallace v. Hinkle Northwest, Inc.*, 79 Or App 177, 179, 717 P2d 1280 (1986).

Plaintiff moved to amend its complaint by pleading a claim for interference with business relations that did not include an existing contract. A claim for intentional interference with economic relations requires the existence of a professional or business relationship, which could include either a contract or a prospective economic advantage. *McGanty v. Staudenraus*, 321 Or 532, 535, 901 P2d 844 (1995). In light of our conclusion that plaintiff's claim for interference with contract was sufficient to withstand summary judgment, it follows that an alternative theory of interference with business

relations not involving an existing contract also would withstand summary judgment. Accordingly, the trial court erred in denying plaintiff's motion to file an amended complaint.

Finally, plaintiff assigns error to the trial court's partial denial of its motion to compel production of documents. Plaintiff's motion sought to compel production of various commercial records from defendant. Defendant objected that the information was too confidential to be shared with a competitor such as plaintiff. At defendant's suggestion, the court reviewed the disputed documents *in camera*. After reviewing the documents, the court ordered the production of some of the requested documents but declined to order production of others, including financial records relating to defendant's internal costs and bidding assumptions for its contract with Nike.

On appeal, plaintiff argues that the withheld documents are "relevant, and at the very least, reasonably calculated to lead to the discovery of admissible evidence." Defendant responds that the withheld documents contain confidential commercial information and that the trial court's denial in part of plaintiff's motion to compel did not constitute an abuse of discretion. Plaintiff is entitled to discover documents regarding "any matter, not privileged, which is relevant" to plaintiff's claims, subject to the trial court's exercise of discretion to limit or deny the disclosure of confidential commercial information. ORCP 36 B; *see* ORCP 36 C(7). We also have examined the questioned documents *in camera* and reject without elaboration plaintiff's contention that the trial court's decision constituted an abuse of discretion.

Summary judgment on claims for intentional interference with economic relations and unjust enrichment reversed; order denying plaintiff's motion to file amended complaint reversed; otherwise affirmed.